AMERICAN FERTILIZING CO. *v.* BOARD OF AGRICULTURE OF NORTH CAR-
OLINA *et al.*

*(Circuit Court, E. D. North Carolina.  August 14, 1890.)*

1. CIRCUIT COURT—JURISDICTION—AMOUNT IN CONTROVERSY.
   In a suit to enjoin the enforcement of a state tax, claimed to be unconstitutional,
   the subject of controversy is not limited to $500, the tax imposed for a single year;
   nor can it be determined, on a motion to dissolve the temporary injunction, that
   the damages will be less than $2,000, the sum required to give the court jurisdic-
   tion, where plaintiff asks to be relieved from threatened penalties and interference
   with its business, the damage to result from which it places at $10,000.

2. CONSTITUTIONAL LAW—TAXATION—DUTIES ON IMPORTS--INSPECTION LAWS.
   Code N. C. § 2190. as amended by Act March 7, 1877, § 8, declares that no commer-
   cial fertilizers shall be sold or offered for sale until the manufacturer or importer
   obtain a license from the treasurer of the state, for which shall be paid a privilege
   tax of $500 per annum for each separate brand.  Sections 22 and 23 appropriate the
   revenues arising from the tax to an industrial association and other purposes.
   *Held,* that the statute is void, in that it violates Const. U. S. art. 1, § 10, providing
   that "no state shall, without the consent of congress, lay any imposts or duties on
   imports,  *  *  *  except what may be absolutely necessary for executing its in-
   spection laws," and is also an interference with interstate commerce.

3. SAME—PRIVILEGES OF CITIZENS.
   The act is not unconstitutional as abridging the privileges and immunities of the
   citizens of other states.

In Equity.
Before BOND and SEYMOUR, JJ.

SEYMOUR, J.   The plaintiff, a citizen and resident of Virginia, brings
this suit against the board of agriculture of North Carolina, to perpetu-
ally enjoin the latter from enforcing against it the state tax on fertilizers.
The act in litigation (Code, § 2190, amended and re-enacted in the statute
of March 7, 1877) provides, in section 8 of the last-mentioned statute,
as well as in the act which it amends, brought forward in the Code, that
no commercial fertilizers shall be sold or offered for sale until the manu-
facturer or importer obtain a license from the treasurer of the state, for
which shall be paid a privilege tax of $500 per annum for each separate
brand.   The plaintiff alleges that it is engaged in the manufacture and
sale of commercial fertilizers; that it has a large and profitable business
in North Carolina, amounting annually to over $25,000; that it has on
hand in the state more than $2,000 worth of fertilizers; that defendants
have, under the pretext that they are subject to forfeiture for non-pay-
ment of such tax, seized a car-load of its fertilizers, and that they threaten
that they will seize all fertilizers which plaintiff has shipped, or shall ship,
into the state; and will prosecute its agents for misdemeanor in selling its
fertilizer without having obtained the license required by the statutes
above cited.   Plaintiff further avers that, unless defendants are restrained,
its business will be entirely destroyed, and it will be damaged in a sum
exceeding $2,000, and that its goods in excess of $2,000 will be seized by
defendants under the provisions of such legislation.   Defendants by their
answer admit the seizure of the fertilizer, as alleged in the complaint, and
aver that the cause of such seizure is the failure and refusal of plaintiff to
pay a license tax of $500, as required by the laws of the state.   They

also admit that, unless restrained by this court, they will continue to make seizures and institute prosecutions against plaintiff's agents, etc., and insist that the tax in question is valid, both as a tax on the trade of selling commercial fertilizers, and further as a police regulation of the state.

The case has been argued at the present term on a motion made by defendant upon the pleadings to dissolve the injunction heretofore granted by the circuit judge. It is claimed at the outset, that the court has no jurisdiction, on the ground that the amount in controversy is less than $2,000. We do not think the subject of the controversy limited to the sum of $500, the tax imposed. The tax is an annual one, and the value to plaintiff of the injunction cannot be measured by the tax of a single year. Moreover, plaintiff asks to be relieved from threatened penalties and from interference with its business, illegal if this tax upon its brand of fertilizers is unconstitutional, the damage to result from which it places at a large sum. The court cannot, at this stage of the case, determine that such damages will be less than the sum required to give it jurisdiction. *Railroad Co.* v. *Ward,* 2 Black, 485, seems to us in point. It was an action brought for the abatement of a bridge as a public nuisance. To the objection that the damages sustained by plaintiff were not sufficient to give the court jurisdiction, CATRON, J., says:

"The character of the nuisance and the sufficiency of the damage sustained is to be judged by the courts; but the want of a sufficient amount of damage having been sustained to give the federal court jurisdiction will not defeat the remedy, as the removal of the obstruction is the matter in controversy, and the value of the object must govern."

In the southern district of New York, a suit brought to restrain the maintenance of an awning over a part of Great Jones street, having been removed to the circuit court, a motion to remand was made, on the ground that the matter in dispute did not exceed $500. The court in denying the motion said:

"The matter in dispute is the value of the right to maintain the awning, not the amount of damages done by it to plaintiff. This appears to be more than $500." *Whitman* v. *Hubbell,* 30 Fed. Rep. 81.

And in the same court, in an action for infringement of a trade-mark, WHEELER, J., says:

"There would be difficulty in maintaining the jurisdiction if the profits to be recovered were the measure of the orator's rights involved; but that is not so understood. An injunction may be of much greater value to the orator than any amount he may show himself entitled to, and it cannot be said now that such value may not exceed the limit required." *Symonds* v. *Greene,* 28 Fed. Rep. 834.

We are therefore of the opinion that the amount in controversy is not below that required to give jurisdiction.

The main question is whether or not the tax is unconstitutional. No doubt a state may tax any person for the privilege of doing any particular business therein, unless prevented by some section of the constitution of the United States. *McCulloch* v. *Maryland,* 4 Wheat. 316, 429.

The contention of the plaintiff is that it cannot be taxed, under the provisions of the legislation above set forth, because (1) such taxation infringes upon the rights of citizens of other states, and therefore violates article 4, § 2, of the constitution, which provides that "the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states;" and also article 14, § 1, of the amendments to the constitution, which provides, among other things, that "no state shall make any law which shall abridge the privileges or immunities of citizens of the United States." (2) Because such taxation is an impost on imports, and therefore violates article 1, § 10, of the constitution, which provides, among other things, that "no state shall, without the consent of the congress, lay any imposts or duties on imports  *  *  *  except what may be absolutely necessary for executing its inspection laws." (3) Because such taxation is an interference with interstate commerce, and therefore violates article 1, § 8, which provides that the congress shall have power "to regulate commerce  *  *  *  among the several states."

1. We do not find anything in the legislation in question which brings it within the inhibitions in either section 2, art. 4, of the constitution, or in the fourteenth amendment thereto. No privilege with regard to the sale of commercial fertilizers seems given by the act to any citizen of North Carolina which is denied to the plaintiff, and, unless this be attempted, it can hardly be said that it is deprived of any privilege or immunity which it is entitled to under the constitution, within the meaning of these constitutional provisions.

2. Although the statute in question does not in words impose a tax on fertilizers imported into the state, but one on the privilege of selling or offering them for sale only, it is not now admissible to argue that the latter is not equivalent to the former. That question was settled in *Brown* v. *Maryland*, 12 Wheat. 419. A statute of Maryland required all importers of foreign articles, or other persons selling the same by wholesale, to pay a license tax. The question was whether the imposition of such a tax was a violation of the two first-mentioned provisions of the constitution. MARSHALL, C. J., in delivering the opinion of the court, defined an impost as "a tax levied on articles brought into the country," and held that a tax on the sale of an article is a tax on the article itself, and that a tax on the occupation of the importer is a tax on importation. The tax under consideration is a tax on the privilege of selling; that is, a tax levied and collected in advance upon the occupation of selling commercial fertilizers. It is therefore a tax on the fertilizers. This case, however, differs from *Brown* v. *Maryland*, *supra*, for in that case the license was for selling foreign articles, and in this the articles sold are brought, not from without the United States, but from the sister state of Virginia. The question then arises whether or not the term "imports" in article 1, § 10, includes as well articles brought into one state from another as those imported from abroad. MARSHALL, C. J., in concluding the opinion in the last-cited case, holds that it does. He says, (*Brown* v. *Maryland*, 12 Wheat., at page 449:) "It may be proper to add that we suppose the principles laid down in this case to apply equally to

importations from another state." The contrary is expressly held by Mr. Justice MILLER, delivering the prevailing opinion in *Woodruff* v. *Parham*, 8 Wall. 123, and implied by TANEY, C. J., in *Peirce* v. *New Hampshire*, 5 How. 554. Both of these cases may be considered overruled in *Leisy* v. *Hardin*, 135 U. S. 100, 10 Sup. Ct. Rep. 681, (*The Original Package Case.*) Certainly the latter is. But whatever may be the result of the reasoning of the chief justice in *Leisy* v. *Hardin*, it is not expressly decided in that case that the term "import" applies to an article brought from one state into another. Were it not for the decision in *Woodruff* v. *Parham* we would not hesitate to say that it included, as Chief Justice MARSHALL evidently supposed that it did, goods brought from one state into another. Before the adoption of the constitution, and therefore at the time when it was framed, and its phraseology discussed, an article brought from Pennsylvania to North Carolina would have been said to be imported into North Carolina, and a tax on it would have been called an "import tax." It is difficult to say by what other name such a tax, if it could be laid, would be now styled. But, excepting in its relation to the power of congress to allow the levying by a state of a tax like the one under discussion, it is immaterial whether such a tax is an import tax or not; for, beyond doubt, if it be not a tax on imports it is a tax on interstate commerce.

3. It is therefore a violation of article 1, § 8, of the constitution. Precisely the same reasoning and the same authority as that used in the preceding paragraph prove that a tax on the privilege of selling or offering to sell fertilizers bearing a particular brand, and brought into North Carolina from another state, is a tax on commerce between the states. Being a tax on "commerce among the several states," the power to levy it must be denied to a state, on the reasoning of MARSHALL, C. J., in *McCulloch* v. *Maryland*, *supra*, which has ever since the rendition of that opinion been uniformly acquiesced in by the profession. It is there held that the power to tax involves the power to destroy, and therefore that its uncontrolled existence in the states is incompatible with the power of the federal government to regulate such commerce. It may perhaps be said that the argument does not apply to a case where the taxation makes no attempt to discriminate injuriously against the products of other states, and that such is the case with the statute *sub lite*. It is true that the North Carolina statute does tax all manufactured fertilizers offered for sale in the state, whether manufactured there or elsewhere; but, as is said by BRADLEY, J., in *Robbins* v. *Taxing-Dist.*, 120 U. S. 489, 7 Sup. Ct. Rep. 592: "It is immaterial that no discrimination is made; * * * interstate commerce cannot be taxed at all, even though the same amount of tax should be laid on domestic commerce." The question of the equality of taxation is in terms excluded, if we consider the statute from the point of view of section 10, for that says that no tax on imports shall be levied. It seems equally immaterial with reference to section 8, for a tax must interfere with commerce if it in any degree has the effect of diminishing its volume; and that must necessarily be in a greater or less degree the result of any taxation on an article, whether

it be at discriminating or at an equal rate. In either case it diminishes sales, and therefore importations. The only conceivable case in which the amount of importations would not be reduced would arise were a state to tax its own productions more largely than imported goods. But even that would be only an apparent exception. The impost would still have the direct effect of checking importations, although the state tax on its own productions, having a still greater effect in reducing their consumption, might more than counteract the reduction of importations caused by the impost. Passing, however, from this view, drawn from the express words of the constitution, and returning to Judge MARSHALL's celebrated argument that the power to tax necessarily includes the power to destroy, and is therefore inconsistent with the power of the United States to preserve commerce between the states, it may be remarked that, if the power were given to a state to tax all imports from other states without control, provided equal taxation were laid upon the same articles if produced or made in the state, the states would practically have the power to prohibit the introduction of any article not made in the state. North Carolina might tax the importation of manufactured cloths, and Massachusetts that of cotton or tobacco. If this tax can be sustained, it is certain that a license tax in these words would be constitutional: "No manufactured cotton shall be sold or offered for sale in this state until the manufacturer or person importing the same shall first obtain a license therefor," etc., "and pay a tax of five hundred dollars." A similar tax upon the different brands of tobacco might be levied in any state that does not manufacture tobacco. But it is needless to multiply illustrations which every one can supply for himself. It must be evident that a requirement of equality of taxation on the imported and home article would be no protection against such taxation as would seriously check. if it did not destroy, commerce between the states, and would impair, to the point almost of rendering its benefits nugatory, the domestic good results of the union of the states.

4. Defendants contend that this taxation can be sustained as a part of the police power of the state. Without attempting, what is perhaps impossible, to accurately define what does and what does not come under the term "police power," it is evident that the taxation in question does not come within the ordinary use of the phrase. "Unwholesome trades, operations offensive to the senses, the deposits of powder, the application of steam-power to propel cars, the building with combustible materials, and the burial of the dead, may all be interdicted by law in the midst of dense masses of population." 2 Kent, Comm. 340; cited by MILLER, J., in the *Slaughter-House Cases*, 16 Wall. 62. This is called the "police power." If the legislation in question can properly be referred to that power, it will be because the right to pass inspection laws may be deemed to have its foundation in the police power of a state. Certainly if it be anything but what the act itself seems to contemplate, —a tax on an occupation or a privilege tax,—it is because it is used to secure an inspection of commercial fertilizers before they can be sold in North Carolina. Such a tax would be constitutional, only within

the limits of the constitution. It cannot be sustained when evidently in excess of what is required for such purpose, and when the proceeds are applied to other uses.

We think that in this case the court might judicially take notice of the evident fact that $500 on a brand of commercial fertilizers is a much larger sum than can be necessary for its inspection. But the court is relieved from all embarrassment in this respect by the fact that the act declares, by necessary implication, that the tax is not needed for inspection expenses. In section 22, $500 of the money received from the tax on fertilizers is appropriated to the North Carolina Industrial Association, and, in section 23, $41,000 is given to pay the expenses of the department of agriculture, including $20,000 for the completion of the oyster survey; and "all other revenues arising from the tax on fertilizers" are "appropriated to the establishment of an agricultural and mechanical college." The motion to dissolve the injunction is denied.

, BOND, J., concurs.