BOARD OF TRUSTEES OF WHITMAN COLLEGE v. BERRYMAN et al.

(Circuit Court, E. D. Washington, S. D.   June 4, 1907.)

No. 250.

1. COURTS—JURISDICTION OF FEDERAL COURTS—AMOUNT IN DISPUTE.

In a suit by an educational corporation to restrain public officers from levying and collecting taxes upon its property under an alleged exemption in its charter, the value of the matter in dispute for the purpose of determining the jurisdiction of a federal court is not limited to the amount of the particular tax which has been or is threatened to be levied, but is the value of the right to the exemption claimed.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, §§ 890, 891.

Jurisdiction of circuit courts as dependent on amount in controversy, see notes to Auer v. Lombard, 19 C. C. A. 75; Tennent-Stribling Shoe Co. v. Roper, 36 C. C. A. 459.]

2. SAME—FEDERAL QUESTION.

Such a suit is one arising under that provision of the Constitution of the United States prohibiting the impairment of contracts by a state, and is within the jurisdiction of a federal court, without regard to the citizenship of the parties.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, § 82.]

Jurisdiction in cases involving federal question, see notes to Bailey v. Mosher, 11 C. C. A. 308; Montana Ore-Purchasing Co. v. Boston & M. C. Co.'s Mining Co., 35 C. C. A. 7.]

3. TAXATION—STATUTORY EXEMPTION—CONSTRUCTION.

A provision of a charter of an educational corporation granted by legislative act, that "the property of said board of trustees of Whitman College, including all income and proceeds shall be used exclusively for the purposes of education and in consideration of said use, said property, income and proceeds, shall not be subject to taxation," includes within the exemption all property of the corporation, whether used directly for college purposes or as a source of income.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 45, Taxation, § 398.]

4. TERRITORIES—LEGISLATIVE POWER—CORPORATE CHARTERS.

Act March 2, 1867, c. 150, 14 Stat. 426, which provides that "the legislative assemblies of the several territories of the United States shall not, after the passage of this act, grant private charters or especial privileges, but they may by general incorporation acts permit persons to associate themselves together as bodies corporate for mining, manufacturing, and other industrial pursuits," did not deprive a territorial Legislature of power in amending an existing charter of an educational corporation to provide that its property shall be exempted from taxation.

5. SAME.

Under Rev. St. § 1850, providing that legislative acts of territories "shall be submitted to Congress, and if disapproved shall be null and of no effect," where such an act has been on the statute books for many years without any expression of disapproval by Congress, the implication is warranted that it was approved.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 45, Taxation, § 18.]

6. TAXATION—TAX SALE CERTIFICATE—ACTION TO SET ASIDE—NATURE OF REMEDY—ADEQUACY OF REMEDY AT LAW.

Under the revenue laws of Washington, which provide for the issuance of certificates of delinquency for unpaid taxes which bear 15 per cent. interest and are liens on the property, such a certificate is a cloud upon the title to real estate, and an owner of a number of parcels against which

taxes have separately been wrongfully imposed is without adequate remedy at law and may maintain a suit in equity to remove such cloud.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 45, Taxation, §§ 1583, 1584.]

In Equity. On demurrer to bill.

George Turner, Thomas Burke, W. T. Dovell, and Allen H. Reynolds, for complainant.

Lester S. Wilson and Otto B. Rupp, for defendants.

WHITSON, District Judge. Elkanah Walker, Cushing Eells, and others, on the 20th day of December, 1859, secured a charter from the Legislature of Washington Territory for the establishment of an educational institution to be devoted to the instruction of persons of both sexes in science and literature. The persons therein named and their successors were declared to be a body politic and corporate, in law, by the name and style of the "President and Trustees of Whitman Seminary." It was provided that the corporation should have perpetual succession, with power to acquire, possess, and hold property, real, personal, and mixed, and to sell, grant, convey, rent, or otherwise dispose of the same at pleasure; with power to sue and be sued, plead and be impleaded, in all courts of justice, both at law and in equity. Sess. Laws Wash. T. 1859–60, p. 422.

The persons named in the act of the Legislature accepted the conditions of the grant, and established said seminary at Walla Walla in pursuance of its purposes, and in accordance with the provisions therein contained. It was maintained as Whitman Seminary until the 20th day of November, 1883, when the act was amended by the territorial Legislature. The name was changed to Whitman College, and it was amended in other respects, but in so far as vital to the matter now at issue, reference need only be made to section 6, relating to taxation, which reads as follows:

"That the property of said board of trustees of Whitman College, including all income and proceeds shall be used exclusively for the purposes of education, and in consideration of said use, said property, income and proceeds, shall not be subject to taxation." Sess. Laws Wash. T. 1883, p. 400.

The amendment was accepted; and, being thus empowered, Whitman College became the successor of Whitman Seminary and received by appropriate conveyances its property and assets, and thereafter continued to be, and is now, maintained as an educational institution for the purposes expressed and in accordance with the original act and the amendments thereof.

Thus may be briefly summarized the allegations of the bill in so far as it relates to the history of the subject-matter which leads up to the controversy in this case. That controversy arises out of the attempt of the defendants, who are alleged to be, respectively, the assessor, treasurer, auditor, and board of county commissioners of Walla Walla county, to assess for taxation, and levy taxes upon, certain real property belonging to the complainant, which it is contended is in violation of the amendatory act of 1883, and it has taken the form of a

demurrer to the bill of complaint, which challenges both the jurisdiction of the court and the equity of the bill.

### First, as to Jurisdiction.

(a) It is objected that an amount sufficient to sustain jurisdiction is not disclosed, the tax sought to be collected being $946.32; that the amount of the tax, and not the value of the property taxed, furnishes the criterion by which jurisdiction should be determined, and that future taxation is so speculative and involved in so much uncertainty as not to be the subject of inquiry; that complainant may not be the owner of the property, and if so future taxes may not be assessed. As to the extent of this rule, we must now inquire.

In Citizens' Bank v. Cannon, 164 U. S. 319, 322, 17 Sup. Ct. 89, 41 L. Ed. 451, the Supreme Court, in discussing the question, said:

"The purpose of the bill is to restrain certain tax assessors and tax collectors from collecting taxes for specific years, and, if the amount of such taxes does not confer jurisdiction, it is, from the nature of things, impossible for a court to foresee what, if any, taxes may be assessed in the future."

So it was thus stated in Holt v. Indiana Mfg. Co., 176 U. S. 72, 20 Sup. Ct. 272, 44 L. Ed. 374:

"And the effect on future taxation of a decision that the particular taxation is invalid cannot be availed of to add to the sum or value of the matter in dispute."

That the rule is well settled the following authorities will attest: Fishback v. Western Union Tel. Co., 161 U. S. 96, 16 Sup. Ct. 506, 40 L. Ed. 630; Washington, etc., R. v. District of Columbia, 146 U. S. 231, 13 Sup. Ct. 64, 36 L. Ed. 951; New England Mortgage Security Co. v. Gay, 145 U. S. 123–130, 12 Sup. Ct. 815, 36 L. Ed. 646; Northern Pacific Railroad Co. v. Walker, 148 U. S. 392, 13 Sup. Ct. 650, 37 L. Ed. 494; Walter v. Northeastern Railroad, 147 U. S. 370, 13 Sup. Ct. 348, 37 L. Ed. 206; Clay Center v. Farmers' Loan & Trust Co., 145 U. S. 224, 12 Sup. Ct. 817, 36 L. Ed. 685; Mayor, etc., of Baltimore v. Postal Tel. Cable Co. (C. C.) 62 Fed. 500; Linehan Railway Transfer Co. v. Pendergrass, 70 Fed. 1, 16 C. C. A. 585; Woodman v. Ely (C. C.) 2 Fed. 839; Murphy v. East Portland (C. C.) 42 Fed. 308.

Nor can the contingent loss which may be sustained by either of the parties through the probative effect of the judgment, however certain it may be that such loss will occur, be considered for the purpose of sustaining jurisdiction. New England Mortgage Co. v. Gay, 145 U. S. 123, 12 Sup. Ct. 815, 36 L. Ed. 646; Rude v. Westcott, 130 U. S. 152, 9 Sup. Ct. 463, 32 L. Ed. 888; Elgin v. Marshall, 106 U. S. 578, 1 Sup. Ct. 484, 27 L. Ed. 249; Gibson v. Shufeldt, 122 U. S. 27, 7 Sup. Ct. 1066, 30 L. Ed. 1083; Bruce and Another v. Manchester & Keene Rd., 117 U. S. 514, 6 Sup. Ct. 849, 29 L. Ed. 990.

In the latter case it was held:

"The matter in dispute, on which the jurisdiction of this court depends, is the matter which is directly in dispute in the particular cause in which the judgment or decree sought to be reviewed has been rendered; and the court is not permitted, for the purpose of determining its sum or value, to estimate its collateral effect in a subsequent suit between the same or other parties."

These authorities would at first blush appear to deny the jurisdiction of the court in this case. Such was my firm conviction at the conclusion of the oral arguments. The correct solution of the question turns upon what is in dispute here; whether it is the taxes now assessed, and which may in the future be assessed, or whether it is the right to be exempt from taxation pursuant to the terms of the statute. That the Supreme Court had in mind a distinction in this regard is disclosed by reference to Citizens' Bank v. Cannon, supra, where this language was used:

"It is further argued that jurisdiction may be seen in the averment of the bill that the value of the exemption of the bank's property during the continuance of its charter exceeds $2,000 for each parish. But the answer to this is that this is not a suit to exempt property from taxation permanently. The purpose of the bill is to restrain certain tax assessors and tax collectors from collecting taxes for specific years, and, if the amount of such taxes does not confer jurisdiction, it is, from the nature of things, impossible for a court to foresee what, if any, taxes may be assessed in the future."

Complainant was seeking in this case to enforce an exemption granted by the laws of the state of Louisiana, but the object sought was to be exempt from the payment of taxes already assessed, asserted, it is true, by reason of the act of exemption and in reliance upon it; but the purpose of the suit related wholly to particular taxes less than the jurisdictional amount, together with those anticipated for succeeding years.

In Scott v. Donald, 165 U. S. 58, 17 Sup. Ct. 265, 41 L. Ed. 632, interference with the right to import liquors into South Carolina was the ground upon which an injunction was sustained. It is true in that case it was stipulated between the parties that the right to import liquors in the manner in which the complainant had been importing them, and intended in the future to import them, was of the value of $2,000 and upwards; but the stipulation related purely to a question of fact, and the jurisdiction could only have been sustained upon the principle that complainant's right to import liquors was the matter in dispute, for the tax complained of was an insignificant amount.

Lanning v. Osborne et al. (C. C.) 79 Fed. 657, involved water rates for irrigation which had been fixed at $3.50 per acre; the purpose of the suit being to establish the right to collect $7 per acre. In referring to the argument of counsel against jurisdiction, Judge Ross, in sustaining it, said:

"I am unable to see the least ground for their contention. But for the high character of the counsel, and for the earnestness with which they press the point, I should be disposed to think it little less than absurd to say that the subject-matter of the controversy between the complainant and the respective defendants is the sum of $3.50—the mere difference between the annual rate contended for by the defendants and that to which the complainant asserts a right. The real subject of the controversy is the asserted right on the part of the land and town company to establish the rates at which it will furnish water to the defendants for the purpose of irrigation, in the absence of any action on the part of the board of supervisors of the county. The establishment of that right, denied by the defendants, is the principal object of the bill, and it is the value of that right which constitutes the amount in controversy. Railway Co. v. Kuteman, 4 C. C. A. 503, 54 Fed. 547; Fost. Fed. Prac. § 16; Stinson v. Dousman, 20 How. (U. S.) 461, 15 L. Ed. 966; Railroad

Co. v. Ward, 2 Black (U. S.) 485, 17 L. Ed. 311. The bill shows the value of that right to be more than $2,000."

Nashville, C. & St. L. Ry. Co. v. McConnell et al. (C. C.) 82 Fed. 65, was a suit to restrain "scalpers" from buying and reselling tickets to the Tennessee Centennial Exposition. It was held, upon application for an injunction, that the amount in dispute was not determined by the amount which the complainant might recover from the defendant in an action at law for the acts complained of, but by the value of the right to be protected, or the extent of the injury to be prevented by the injunction. So in a suit for injunction to prevent unlawful interference with the complainants' business, it has been held in this circuit that the value of the right to carry on such business is the matter in dispute. Evenson et al. v. Spaulding et al. (C. C. A.) 150 Fed. 517.

The value of the property described is alleged to be $10,000. The grounds relied upon for relief are as follows:

"That if taxes are levied upon the property of the said Board of Trustees of Whitman College, as aforesaid, and collection thereof enforced, as it is hereinbefore set forth, collection thereof will be attempted to be enforced by said defendants unless restrained by order of this court, and the said Board of Trustees of Whitman College will be compelled to pay as taxes upon its property aforesaid, annually, a large sum, to wit, a sum in excess of $2,500."

It is also alleged:

"And this complainant asserts, and by this action seeks to enforce, a right perpetual to the exemption from taxation of all the property, real and personal, of said complainant."

"That the matter in dispute herein exceeds, exclusive of interest and costs, the sum or value of $2,000."

And complainant prays, among other things, "to be perpetually exempt from taxation under the laws of the state of Washigton."

Accepting these averments as they must be considered for the purposes of the present inquiry, it would be premature to say that, if donations have been made upon the strength of the assurance that taxes would not be levied upon the property of complainant as alleged in the bill, its right to be so exempt may not be of greater value than the amount essential to retain the cause in this court, for it may well be supposed that the withdrawal of that favor would deter others from making like donations, and the effect of the change upon the status of its property, and upon the efficiency of the institution itself, might be such as to depreciate its charter to an extent sufficient to bring it within the power of the Circuit Court to entertain the contention which the complainant makes. If the right which the complainant seeks to enforce is of such a value, then a very different question is presented from that of a tax less in amount than that which the court is authorized to consider, even though such relief be sought under a valid statute which gives exemption. The scope of the bill is clearly one beyond mere relief against the tax which is mentioned. The value of the right to be exempt from taxation must be found before it can be held that the complainant is remediless here.

It is true the validity of a tax less than $2,000 is incidentally involved, but that cannot be construed as a limitation upon the broader purpose

in view. The value of the matter in dispute is the test by which jurisdiction is determined. Smith v. Adams, 130 U. S. 167, 9 Sup. Ct. 566, 32 L. Ed. 895; Stinson v. Dousman, 20 How. (U. S.) 461–467, 15 L. Ed. 966; American Fertilizer Company v. Board of Agriculture of North Carolina, 43 Fed. 609, 11 L. R. A. 179; Simon et al. v. House et al., 46 Fed. 317; Humes v. City of Ft. Smith, Ark. (C. C.) 93 Fed. 857; Delaware, L. & W. Co. v. Frank (C. C.) 110 Fed. 694; Southern Express Co. v. Mayor, etc., of Ensley (C. C.) 116 Fed. 756; City of Hutchinson v. Beckham, 118 Fed. 401, 55 C. C. A. 333; Pennsylvania Company v. Bay (C. C.) 138 Fed. 203.

(b) The parties, complainant and defendants, are citizens and residents of this district. Complainant relies upon section 10, art. 1, of the Constitution of the United States, which prohibits the impairment of contracts, and upon the act of Congress which vests in the Circuit Courts power to hear controversies arising under the federal Constitution and laws. 25 Stat. 434, c. 866.

The power to hear the cause by reason of the amount involved appearing to be sufficient, the position of complainant's counsel has the sanction of authorities which need only be cited to illustrate their controlling force upon this phase of the case. Given v. Wright, 117 U. S. 648–655, 6 Sup. Ct. 907, 29 L. Ed. 1021; Yazoo, etc., R. R. Co. v. Thomas, 132 U. S. 174, 10 Sup. Ct. 68, 33 L. Ed. 302; Wilmington & Weldon R. R. Co. v. Alsbrook, 146 U. S. 279, 13 Sup. Ct. 72, 36 L. Ed. 972; Illinois Central R. R. Co. v. Adams, 180 U. S. 28, 21 Sup. Ct. 251, 45 L. Ed. 410; Starin v. New York, 115 U. S. 257, 6 Sup. Ct. 28, 29 L. Ed. 388; Walla Walla v. Walla Walla Water Co., 172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341; Vicksburg Water Power Co. v. Vicksburg, 185 U. S. 65, 22 Sup. Ct. 585, 46 L. Ed. 808; Nashville Ry. Co. v. Taylor (C. C.) 86 Fed. 168. Notwithstanding the fact that Trustees of Dartmouth College v. Woodward, 4 Wheat. 519, 4 L. Ed. 629, has been many times before the courts, often distinguished, and variously applied, yet the principle there announced that a charter constitutes a contract has never been overturned, and it has been expressly applied to legislative grants exempting from taxation. Asylum v. New Orleans, 105 U. S. 369, 26 L. Ed. 1128; Washington University v. Rouse, 8 Wall. (U. S.) 439, 19 L. Ed. 498; Dodge v. Woolsey, 18 How. (U. S.) 331, 15 L. Ed. 401; State Bank of Ohio v. Knoop, 16 How. (U. S.) 369, 14 L. Ed. 977; Farrington v. Tennessee, 95 U. S. 679, 24 L. Ed. 558.

Assuming now, because is so appears by the allegations of the bill, that the amendatory act was based upon a sufficient consideration, we are led to inquire as to the validity of the plaintiff's contract, and whether it would be impaired by the levy and collection of taxes upon its property. Thus we are brought to the most important question to be considered.

The suggestion made in argument that those properties not devoted to the actual use of the college—that is, occupancy for educational purposes—do not fall within the language of the act, may be dismissed with the remark that such a construction is not consistent with the manifest intent of the Legislature, namely, to establish an educational institu-

tion, and to provide assistance for it by exempting its property from the burdens imposed for governmental purposes. The contention is neither justified by the letter nor the spirit of section 6. The provision "that the property of said Board of Trustees of Whitman College, including all income and proceeds, shall be used exclusively for the purposes of education," and shall be exempt from taxation, must be construed in view of the well-known ways by which such institutions are endowed. The privilege granted would be of but slight consequence if it could only apply to the buildings and grounds occupied for the uses of the college as such. The word "income," taken in connection with the context, clearly indicates an intent to exempt property available for the maintenance of the college. Home of the Friendless v. Rouse, 8 Wall. (U. S.) 437, 19 L. Ed. 495.

It is difficult to conceive how more apt words could have been used to express that intent than those which so concisely and yet comprehensively imply that all the property, whether income producing or otherwise, should be exempt from taxation. In the nature of things, there can be no income from the college buildings. To hold with the contention that words of such clear import were only intended to apply to a part of the property, and to that part from which no income or proceeds could in any way be derived, would be to misinterpret plain language, to override the well-expressed intention, and to overlook that which it must be conclusively presumed was in the minds of legislators when dealing with the subject, namely, that institutions of this character are almost invariably maintained by income derived from investments, and those generally secured by donation.

Passing to the more serious suggestion, which is that it was beyond the power of the territorial Legislature to enact the amendment under which the complainant claims exemption from taxation, and treating this phase of the case as relating to jurisdiction, rather than as discretion in its exercise, it may be remarked, and indeed it is not seriously disputed, that prior to 1867 there was no congressional or other inhibition which would have prevented the enactment of such a statute. The difficulty arises on account of an amendment to the Organic Act of the territory, approved March 2, 1867, which reads as follows:

"That the legislative assemblies of the several territories of the United States shall not, after the passage of this act, grant private charters or especial privileges, but they may by general incorporation acts permit persons to associate themselves together as bodies corporate, for mining, manufacturing, and other industrial pursuits." 14 Stat. 426, c. 150.

It will be noted that the original act incorporating Whitman Seminary was at a time prior to the adoption of this amendment, and that the amendment to that act was adopted subsequently. This involves the necessity of inquiry into what was meant by "especial privileges."

As preliminary, it is proper to observe, as counsel have so well argued, that the subject of education has ever been uppermost in the minds of those who have established the outposts of civilization. The log schoolhouse has always accompanied the earlier efforts of pioneer life. It has been understood from the beginning that the means of education, as a rule, should not be called upon to contribute to the public expenses. Experience has shown that attempts of this character

have always been made at the sacrifice of the persons engaged in educational work. The assumption being that no ignorant people could be civilized, it was foreseen that the best available means for moral and material development was by the dissemination of knowledge; and as the work was of a charitable nature, as usual with small reward to those engaged in it, it was thought proper as contributing to the growth of the country to aid by exempting the accumulations received at the hands of charitably disposed persons from the ravages of the tax collector.

These thoughts become peculiarly pertinent to this case when it is recalled that this association of pioneers, as early as 1859, were struggling to carry on what at that time was an undertaking which displayed much public spirit and was of great hardship and self-denial; one which it is well known was of extreme difficulty, considering the early days, the sparsity of settlement, the want of facilities, the absence of wealth, the remoteness from centers of population, and the dangers attending communication with the more highly developed and well-established communities of the country. And, no doubt, in consideration of their efforts, which had in a measure been successful, and for the encouragement of education in the territory, the Legislature deemed it wise to render further assistance, and to give assurance of its approval of their strenuous endeavors by holding out the inducement to them and to their successors, and to those who might look with favor upon their early struggles, that upon any property thus brought together for the public benefit the people of the territory could well afford to forego the mere pittance which might from time to time be thus collected by the levy of taxes. The appreciation of the fact that education and refinement are more likely to go hand in hand with virtue than are illiteracy and ignorance, that they best lead to good citizenship and the good order of the community, constitutes the consideration —the public benefit—which justifies the exemption from taxation which the Legislature saw fit to give. It was fitting that such prescience should have induced so commendable an effort to commemorate, in the beautiful valley where he met his tragic death, the heroic deeds of one who contributed so much to the assertion of our title to the Oregon country since fully assured through his material aid, and which has become so vast an empire of wealth and civilized life.

There was no contemporaneous grudging of favors, whether asked of the public or bestowed by the munificence of individuals, and I cannot refrain from mentioning with lively recollection the wonderment expressed by counsel at the bar that an institution of so much merit should meet with so technical a contention in the house of its friends. Not being organized for profit, and promoters of such institutions being able to receive no reward except that which goes with good works, it is hardly to be supposed that the evils which Congress intended to remedy, when it laid its prohibitory hand upon the power delegated to the Legislatures of the territories, related to matters of the character under review, but rather that it was intended to prevent, as the words so clearly imply, the granting of corporate charters by legislative action, and the giving of exclusive rights, such as the building of public highways, toll roads, ferry and bridge franchises, and the like, which

had come to be an abuse, at least in the territory of Washington, as an examination of the session laws will abundantly disclose. Sess. Laws 1857–58, pp. 45, 46, 48; Sess. Laws 1859–60, pp. 415, 417, 418, 428, 430, 439, 440, 442, 443, 445, 447, 449, 450, 453, 459, 460, 463, 464, 465, 467, 472, 473; Sess. Laws 1860–61, pp. 72, 74, 75, 79, 82, 84, 86, 88, 97, 105, 107, 110, 112, 115, 116, 123, 128; Sess. Laws 1861–62, pp. 63, 65, 69, 75, 80, 81, 83, 89, 90, 91, 92, 99, 102, 105, 108, 114, 115, 117, 119, 124, 128, 130, 131, 132, 133, 135; Sess. Laws 1862–63, pp. 57, 61, 63, 65, 66, 67, 70, 73, 75, 76, 77, 78, 84, 86, 88, 89, 90, 91, 93, 95, 96, 100, 101, 102, 103, 104, 105, 107, 108, 109, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132; Sess. Laws 1864–65, pp. 90, 91, 93, 94, 95, 97, 98, 99, 100, 102, 103, 105, 107, 108, 114, 120, 124, 144, 148; Sess. Laws 1865–66, pp. 169, 172, 178, 180, 186, 188, 189, 193, 196, 200, 204, 207, 210; Sess. Laws 1866–67, pp. 207, 211, 213, 216, 218.

These numerous acts have been referred to as showing to what alarming extent the forming of private corporations by legislative action and the granting of monopolies had gone. It is fair to assume that it was in this respect, and with this departure from ordinary legislative methods in view, that the words "especial privileges," coupled as they were with private charters, were intended to relate. Such enactments are notably absent from the session laws after the congressional act of 1867, and from this it may be fairly deduced by the cotemporaneous understanding that Congress intended to check this tendency, which had so distinctly manifested itself in the industrial development of the people. Thus we must conclude, contrary to that which superficially appears, that it was not intended in the early days of western development to prevent the struggling pioneers from aiding those who were seeking to build up schools and colleges; that nothing was further from the intent of Congress than to hinder, harass, or annoy such efforts, or to deprive the people from giving such encouragement as has from the earliest settlements been so often and so freely accorded.

If this be the correct view, it disposes of this branch of the case. We are not without authority giving the construction upon which complainant relies. Immunity from taxation conferred on a corporation by legislation is not a franchise; nor does such immunity pass under a decree providing that the purchaser shall succeed to all franchises, rights and privileges. Chesapeake & Ohio Railway Co. v. Miller, 114 U. S. 176, 5 Sup. Ct. 813, 29 L. Ed. 121. In the sale of a franchise transferring all "rights, privileges, and immunities" of one insurance company to another, the right to be exempt from taxation granted to the first company did not pass by the use of those words. Phœnix Ins. Co. v. Tennessee, 161 U. S. 174, 16 Sup. Ct. 471, 40 L. Ed. 660. "The term 'especial privileges' refers to the granting of monopolies such as ferries, trade-marks, the exclusive right to manufacture certain articles, or to carry on certain business in a particular locality to the exclusion of others." Elk Point v. Vaughn, 46 N. W. 577, 1 Dak. 113. The constitutional provision that the Legislature shall not pass "a private or local bill * * * granting to any private corporation * * * any exclusive privilege" does not prohibit the enactment of a statute providing for payment of percentage upon gross premiums

in lieu of other taxes. Trustees of Exempt Firemen's Fund v. Roome, 93 N. Y. 313, 45 Am. Rep. 217. The term "privileges" does not include immunity from taxation, unless the other provisions of the act give such meaning to it. Pickard v. Tennessee, etc., Railroad Co., 130 U. S. 642, 9 Sup. Ct. 640, 32 L. Ed. 1051. A grant of lands to a railroad corporation, to be used as passenger and depot grounds and other public purposes, was not a grant of a special or exclusive privilege in violation of the Constitution of Illinois. State of Illinois v. Illinois Cent. R. R. Co. (C. C.) 33 Fed. 730.

There is another view which cannot pass unnoticed. Undoubtedly, Congress could have enacted the statute in question. By section 1851, Rev. St., the legislative power of the territories was extended to all rightful subjects of legislation not inconsistent with the Constitution and laws of the United States. One of the provisions of the Organic Act (section 1850, Rev. St.), reads as follows:

"All laws passed by the legislative assembly and governor of any territory except in any territories of Colorado, Dakota, Idaho, Montana and Wyoming shall be submitted to Congress, and, if disapproved, shall be null and of no effect."

It cannot be said that a law passed by a territorial legislature will become effective as against a previous inhibition contained in the organic act of such territory. On the other hand, the case of Mormon Church v. United States, 136 U. S. 1, 10 Sup. Ct. 792, 34 L. Ed. 481, would seem to hold to the contrary. Yet it is settled that where the act passed involves the construction of a statute, rather than the violation of an act of Congress, it will be assumed, in the absence of express disapproval, that the act was considered as extending to a rightful subject of legislation not inconsistent with the Constitution or laws of the United States. Such in effect was the holding in Miners' Bank v. State of Iowa, 12 How. (U. S.) 1-7, 13 L. Ed. 867, where it is said:

"Congress, in creating the territorial governments, and in conferring upon them powers of general legislation, did not, from obvious principles of policy and necessity, ordain a suspension of all acts proceeding from those powers, until expressly sanctioned by themselves, whilst for considerations equally strong they reserved the power of disapproving or annulling such acts of territorial legislation as might be deemed detrimental. A different system of procedure would have been fatal to all practical improvement in those territories, however urgently called for; nay, might have disarmed them of the very power of self-preservation. The argument would render also the acts of the territorial government, even the most wholesome and necessary, and though indispensably carried to the extreme of authority, obnoxious to the charge of usurpation or criminality. The reverse of this argument, whilst it is accordant with the investiture of general legislative power in the territorial governments, places them in the position of usefulness and advantage towards those they were bound to foster, and subjects them at the same time to proper restraints from their superior."

The inference is warranted that an act duly passed has been submitted for approval, and, where it has been suffered to remain without disapproval for many years, that it was approved. So it has been held:

"In the first place, we observe that the law has received the implied sanction of Congress. It was adopted in 1859. It has been upon the statute book for more than 12 years. It must have been transmitted to Congress soon after it was enacted, for it was the duty of the Secretary of the Territory to

transmit to that body copies of all laws, on or before the 1st of the next December in each year. The simple disapproval by Congress at any time would have annulled it. It is no unreasonable inference, therefore, that it was approved by that body." Clinton v. Englebrecht, 80 U. S. 446, 20 L. Ed. 659; Baca v. Perez, 42 Pac. 162, 8 N. M. 187.

## Equities of the Bill.

The defendant has invoked a rule, often announced by the Supreme Court, a succinct statement of which is found in Pittsburgh Railway v. Board of Public Works, 172 U. S. 37, 19 Sup. Ct. 90, 43 L. Ed. 354, in this language:

"The collection of taxes assessed upon the authority of a state is not to be restrained by writ of injunction from a court of the United States, unless it clearly appears, not only that the tax is illegal, but that the owner of the property taxed has no adequate remedy by the ordinary processes of the law, and that there are special circumstances bringing the case under some recognized head of equity jurisdiction."

Under the revenue laws of the state, after a tax becomes delinquent, certificates of delinquency are issued and sold, which draw interest at the rate of 15 per cent. per annum. By section 1750 of Ballinger's' Ann. Codes and Statutes, it is provided that such certificates of delinquency shall be prima facie evidence that:

"(1) The property described was subject to taxation at the time the same was assessed.

"(2) The property was assessed as required by law.

"(3) The taxes or assessments were not paid at any time before the issuance of the certificate.

"(4) Such certificate shall have the same force and effect as a judgment execution and sale of and against the premises included therein."

It is manifest that such a certificate outstanding, coupled with the provision that all taxes are liens upon the property assessed, would constitute a cloud. That an illegal tax upon real estate is a cloud upon the title, and that a suit in equity may be maintained to remove such cloud, is the settled doctrine in this state. Andrews v. King County, 1 Wash. 46, 23 Pac. 409, 22 Am. St. Rep. 136; Benn v. Chehalis County, 11 Wash. 134, 39 Pac. 365; Phelan v. Smith, 22 Wash. 397, 61 Pac. 31; Kinsman et al. v. Spokane, 20 Wash. 118, 54 Pac. 934, 72 Am. St. Rep. 24; Lewiston Water Co. v. Asotin County, 24 Wash. 371, 64 Pac. 544; Northwestern Lumber Co. v. Chehalis County, 24 Wash. 626, 64 Pac. 787. And the owner has no adequate remedy by the ordinary processes of the law. The complainant would be compelled to resort to a multiplicity of suits, for the statute requires that each parcel be assessed separately, and that separate certificates issue thereon. Such certificates may pass into the hands of different persons, or the county may become the purchaser. The exorbitant rate of interest imposed to insure prompt payment is a serious detriment to one who is in a state of uncertainty as to the validity of a tax upon his property. Remedies at law have expressly been held inadequate. Benn v. Chehalis County, supra; Phelan v. Smith, supra; Northwestern Lumber Co. v. Chehalis County, supra.

It it should be assumed that this suit has no broader scope than to enjoin the collection of a tax, and giving it the most narrow construc-

tion possible, it is not in any way violative of the rule laid down by the Supreme Court that federal courts should entertain suits of this character with reluctance.

For these reasons, the demurrer will be overruled.