THE STATE *v.* J. B. ANDERSON*

(*Knoxville.* September Term, 1921.)

1. **CONSTITUTIONAL LAW.** Legislature not hampered by limitation of taxing power in exercise of police power.

The police power is coexistent with the taxing power, but is in no wise dependent thereon, and in the exercise of the police power the legislature is not hampered by any limitation placed by the Constitution on the exercise of the taxing power of the legislature. (*Post, pp.* 571-580.)

Acts cited and construed: Public Acts, 1919, ch. 61.

Constitution cited and construed: Arts. 1, 2, 11, secs. 8, 18, 28.

2. **ANIMALS.** Dog license tax law valid exercise of police power.

Pub. Acts 1919, chapter 61, requiring persons to pay a license fee to keep dogs, does not levy a tax violative of the limitations of the taxing power under Constitution article 2, section 28, but is a valid exercise of the police power to protect the safety of people and property by reducing the number of dogs. (*Post, pp.* 571-580.)

3. **CONSTITUTIONAL LAW.** Dog license law held not to imprison or deprive of life, liberty, or property without judgment of peers.

Pub. Acts 1919, chapter 61, regulating the ownership and keeping of dogs and requiring payment of license therefor, is not in conflict with Constitution article 1, section 8, which provides that no man shall be taken or imprisoned, or disseised of his freehold, liberties or privileges, or outlawed or exiled, or in any manner destroyed or deprived of her life, liberty, or property, but by the judgment of his peers or the law of the land. (*Post, pp.* 571-580.)

4. **CONSTITUTIONAL LAW.** Dog license law held not to imprison for debt in civil cases.

---

*The original opinion, in this case was filed on December 23, 1920, but was withheld from publication until the incoming of the two dissenting opinions, which were not filed until November 28, 1921.

State v. Anderson.

Pub. Acts 1919, chapter 61, regulating the ownership and keeping of dogs and providing punishment for violations thereof, does not violate Constitution article 1, section 18, prohibiting imprisonment for debt in civil cases. (*Post, pp.* 571-580.)

Cases cited and approved: Blair v. Forehand, 100 Mass., 136; Faribault v. Wilson, 34 Minn., 254; Cranston v. Augusta, 61 Ga., 573; Woolf v. Chalker, 31 Conn., 121; Hendrie v. Kalthoff, 48 Mich., 306; Gibson v. Harrison, 69 Ark., 385; Griggs v. Macon, 103 Ga., 602; State v. Topeka, 36 Kan., 76; Indianapolis v. Bieler, 138 Ind., 38; Duluth Brewing Co. v. Superior, 123 Fed., 356; United States Distilling Co. v. Chicago, 112 Ill., 19; Wallace v. Culanola, 70 Ark., 395; Troll v. Hudson, 78 Mo., 302; State v. Erwin, 139 Tenn., 341.

Cases cited and distinguished: Holst v. Roe, 39 Ohio St., 340; Mitchell v. Williams, 27 Ind., 62; Litchville v. Hanson, 19 N. D,, 672; Carthage v. Rhodes, 101 Mo., 175; Ponder v. State, 141 Tenn., 481.

5. **CONSTITUTIONAL LAW.** Dog license law for benefit of sheep owners not invalid as class legislation.

Pub. Acts 1919, chapter 61, regulating the ownership and keeping of dogs and providing that licenses and fines collected be placed in a "sheep fund" for the payment of damages sustained by owners of sheep maimed or damaged by dogs, is not class legislation in violation of Constitution article 11, section 8. (*Post, pp.* 580-586.)

Cases cited and approved: Longyear v. Buck, 83 Mich., 236; Noble State Bank v. N. C. Haskell, 219 U. S., 104,

Cases cited and distinguished: Van Horn v. People, 46 Mich., 183; Thorpe v. Rutland & Burlington Railway Co., 27 Vt., 140; Cole v. Hall, 103 Ill., 30; McGlone v. Womack, 129 Ky., 274.

6. **ANIMALS.** Cost of administration of dog license act payable out of receipts.

Authority may be implied from the provisions of Public Acts 1919, chapter 61, regulating the ownership and keeping of dogs, for the payment of the cost of the administration thereof out of the funds

State v. Anderson.

derived from the collection of license fees; the act not providing for the payment of any of these expenses out of the public revenue. (*Post, pp.* 586-622.)

Acts cited and construed: Acts 1919, ch. 61; Acts 1867, ch. 130, sec. 7.

Cases cited and approved: Am. Fertilizer Co. v. Board of Agriculture of N. C., 43 Fed., 609; Mayor of Nashville v. Linck, 80 Tenn., 507; Ex Parte Cramer, 62 Tex. Cr. R., 11; A. & P. Telegraph Co., v. Philadelphia, 190 U. S., 160; Cole v. Hall, 103 Ill., 30; State v. Erwin, 139 Tenn., 341; Ponder v. State, 141 Tenn., 481; Fox v. Mohawk & Hudson River Humane Society, 165 N. Y., 517; Commonwealth v. Hazelwood, 84 Ky., 681.

Cases cited and distinguished: Ellis v. Frazier, 38 Ore., 462; Wisconsin Telephone Co. v. City of Milwaukee, 126 Wis., 1; Ottumwa v. Zekind, 95 Iowa, 176; McCullough v. Maryland, 17 U. S., 316; McMillan v. city of Knoxville, 139 Tenn., 324; Postal Telegraph Co. v. Taylor, 192 U. S., 64; Phillips v. Lewis, 3 Shan. Cas., 230; People ex rel. Einsfeld v. Murray, 149 N. Y., 374. Nicchia v. People of State of N. Y., 255 U. S.,—.

Laws cited and construed: Laws 1907, ch. 32.

BACHMAN, J., and L. D. SMITH, Special Judge, dissenting.

---

FROM LOUDON.

Appeal from the Circuit Court of Loudon County.— HON. S. C. BROWN, Judge.

WM. H. SWIGGART, JR., Assistant Attorney-General, for the State.

S. P. DANNEL, for appellee.

MR. JUSTICE HALL delivered the opinion of the Court.

This is an appeal by the State from a judgment of the circuit court of Loudon county quashing an indictment on motion of the defendant.

State v. Anderson.

The indictment is predicated upon chapter 61 of the Public Acts of 1919, regulating the ownership and keeping of dogs, and was quashed by the trial judge upon the ground that said statute is unconstitutional and void. The indictment contains two counts.

The first count charges that the defendant, J. B. Anderson, who is the duly elected and qualified tax assessor for Loudon county, while making the assessment of property for taxation in said county for the year 1920, unlawfully and wilfully did fail, neglect, and refuse, when assessing the property of each property holder in said county, to make diligent, or any, inquiry as to the number of dogs owned, harbored, or kept by the person assessed by him, and failed to make demand for the payment of the license fee required by section 1 of said statute above referred to.

The second count charges that the defendant, acting in his official capacity, willfully failed, neglected, and refused to keep a record of the persons owning dogs in said county, and a record of the dogs paid for with a description thereof in a well-bound book, and did unlawfully and willfully fail, neglect, and refuse to keep a stub record, or a copy of the receipts given by him for money paid to him for dog licenses, as provided by section 2 of said statute.

The motion to quash challenged the constitutionality of said statute upon four grounds:

(1) Because it is in conflict with section 28 of article 2 of the State Constitution, which is the taxing clause of said Constitution.

(2) Because it is in conflict with the provisions of section 8 of article 1 of said Constitution, which provides

that no man shall be taken or imprisoned, or disseised of his freehold, liberties, or privileges, or outlawed or exiled, or in any manner destroyed or deprived of his life, liberty, or property, but by the judgment of his peers or the law of the land.

(3)  Because it is in violation of section 18 of article 1 of said Constitution, prohibiting imprisonment for debt in civil cases.

(4)  Because it is vicious class legislation, and is, therefore, violative of section 8 of article 11 of said Constitution, in that it levies a tax, not for the State or governmental purposes, "but for the purpose of redressing the injuries done, or damage done, to certain individuals through the wrongs or faults of others."

The trial judge sustained the motion to quash, as before stated; his judgment reciting that the court was of the opinion that the statute is unconstitutional for the reasons set forth in the motion to quash, and particularly in the first and fourth grounds of the motion. A judgment was accordingly rendered, and defendant was ordered discharged.

The State assigns the action of the trial judge in quashing said indictment on the several grounds stated in the defendant's motion for error, and insists that the judgment of the trial court should be reversed, and the case remanded to the end that the defendant may be required to answer the charge laid in the indictment upon its merits.

The title of the statute under consideration is as follows:

"A bill to be entitled an act to regulate the owning, keeping or harboring of dogs, so as to protect the safety

State v. Anderson.

of the people and of property; to provide a license fee to be paid for each dog owned, kept, or harbored in this State, and to provide for the disposition of such fees; to provide penalties for the failure of certain officials to enforce this act, and to provide penalties for a violation of the provisions of this act.''

Section 1 of the act fixes the amount to be paid either to the county assessor, or to the county trustee ''as an annual license fee,'' and enjoins on the county tax assessor the duty of making diligent inquiry as to the number of dogs subject to the license fee while he is assessing the property in the county, and of demanding payment when the license fee has not been otherwise paid.

Sections 2 and 5 of said statute define the duties of the county tax assessor with regard to the ascertaining of the dogs on which a license fee is to be paid, with the names of the persons required to pay same, and to define his duties with regard to the collection of said fees.

Section 3 provides the method for the accounting by the tax assessor for money paid to him under the provisions of the statute, and requires that all such money shall be paid to the county trustee, to be kept separately for a fund to be known as the ''sheep fund,'' a record of which is also to be kept by the county court clerk.

Section 6 makes it a misdemeanor in office for the county tax assessor, or the county trustee, or any other person, to fail or refuse to perform the duties enjoined upon them by the provisions of the statute.

Section 7 requires the disclosure by every person subject to taxation in any county of the number of dogs

owned, kept, or harbored by him, or by any member of the family residing with him, and providing further that any person who shall make a false statement under oath to the county assessor, or county trustee, as to the number, kind, and sex of such dog or dogs owned, kept, or harbored by him shall be deemed guilty of perjury, and upon conviction thereof shall be punished by law for such offense.

Sections 4, 8, 9, and 10 define certain acts with regard to the keeping, owning, or harboring of dogs as misdemeanors, and fix the punishment therefor.

Sections 11, 12, and 13 relate to the disposition of all money derived from the license fees, constituting the same as a "sheep fund," for the payment "of damages sustained by sheep owners of sheep killed, maimed or damaged by any dog or dogs within any county of the State." To such fund is also to be added all fines assessed and collected under the provisions of the statute. In section 13 is contained the provision that whenever the name of the owner of any dog killing or damaging sheep is known, the right of action accruing to the owner of the injured sheep against the owner of the dog is required to be assigned to the county trustee, and suit must be brought to reimburse the "sheep fund" for money paid out for such damage.

Section 14 fixes the compensation of the tax assessor for each dog license issued by him, and requires that a metal tag containing an identification number be issued for each dog licensed.

In section 15 it is provided that the statute shall not apply to dogs brought into the State temporarily and solely for the purpose of "bench shows," sport, etc.

Section 16 provides that the license fee for each year must be paid on the first day of each year after 1919, April 15th being prescribed as the day of payment for the year 1919, the statute having been enacted on March 26, 1919.

Section 17 contains provisions with regard to the disposition of the "sheep fund," and provides that that portion of such fund remaining in the hands of the county trustee on May 1st, which was collected during the previous calendar year, must be turned over to and become "a part of the common school fund of the county in which the fund was collected." The "sheep fund" is to be kept on deposit with interest at not less than 3 per cent.

We are of the opinion, after a careful examination of the authorities bearing upon the questions presented, that said statute is not subject to the constitutional objections urged against it, but is a valid exercise of the police power of the State for the purpose, as expressly stated in the title of the statute, of protecting "the safety of the people and of property." The police power is coexistent with the taxing power, but it is in no wise dependent thereon, and in the exercise of the police power the legislature is not hampered by any limitation placed by the Constitution on the exercise of the taxing power of the legislature.

We do not think that the imposition of a license fee as a condition precedent to the right of citizens of this State to own or keep a dog under the terms and purpose of the statute involved, is the levying of a tax under the State's taxing power, but is a method adopted by the

legislature of regulating the keeping of dogs, designed expressly to reduce their number, and to discourage persons from keeping or harboring worthless dogs with vicious tendencies.

The purpose and object of the statute is clearly stated in the first clause of the title as the regulation of the owning, keeping, and harboring of dogs, so as to protect the safety of the people and of property. The remaining clauses of the caption merely relate to the means by which this purpose and object are to be accomplished, by providing a license fee to be paid for each dog, providing for the disposition of such license fees and by providing penalties for the violation of the statute, whether by the official required to enforce it or by the citizen.

There is a marked distinction between taxation for revenue, as authorized and limited by section 28 of article 2 of our Constitution and the imposition of license fees for the purpose of regulation in the exercise of the police power of the state.

The rule is stated by Mr. Cooley, in his work on Taxation, vol. 3 (3d Ed.), 1125, as follows:

"There are some cases in which levies are made and collected under the general designation of taxes, or under some term employed in revenue laws to indicate a particular class of taxes, where the imposition of the burden may fairly be referred to some other authority than to that branch of the sovereign power of the State under which the public revenues are apportioned and collected. The reason is that the imposition has not for its object the raising of revenue, but looks rather to the

regulation of relative rights, privileges, and duties as between individuals, to the conservation of order in the political society, to the encouragement of industry, and the discouragement of pernicious employments. Legislation for these purposes it would seem proper to look upon as being made in the exercise of that authority which is inherent in every sovereignty, to make all such rules and regulations as are needful to secure and preserve the public order, and to protect each individual in the enjoyment of his own rights and privileges by requiring the observance of rules of order, fairness, and good neighborhood by all around him. This manifestation of the sovereign authority is usually spoken of as the police power.''

In *Holst* v. *Roe,* 39 Ohio St., 340, 48 Am. Rep., 459, which is a case involving a statute similar to the one under consideration, this distinction is further recognized in the following language:

''The police and taxing powers of the General Assembly, though coexistent, are distinct powers; hence the exercise of the former is not restrained by the existence of the latter, though it may result in producing revenue, as, for instance, in imposing fines in punishment for offenses.''

In *Mitchell* v. *Williams,* 27 Ind., 62, a case involving a similar statute, the court said: ''It is a matter of no consequence how the sum charged to the owner of a dog may be collected. If it be deemed more convenient to place it upon the tax duplicate, it does not therefore make it a tax, and subject to the constitutional objection.''

In Tiedeman on State and Federal Control of Person and Property, vol. 2, pp. 845, 846, it is stated:

"Regulations of this general character are to be found in very many, if not most, of the States. The constitutionality of laws has been very generally sustained which authorized the killing of all dogs without a collar. And it has frequently been held lawful for the State, as an encouragement for the rearing of sheep, to discourage the keeping of dogs by the requirement of a license fee for each dog. And, conceding the right of the State to require a license fee for the keeping of a dog, which is intended to operate as a check upon the keeping of dogs, the amount of the license is not open to judicial revision. It cannot be confined by judicial intervention to the mere expense of issuing the license. In order to operate as a restraint upon the keeping of dogs, the amount of the license must be large enough to make it burdensome to keep dogs, and, as has been fully explained in connection with the discussion of licenses in general, the imposition of such license, as a restraint upon the doing of something which inflicts or threatens to inflict injury on the public, is free from all constitutional objections."

In R. C. L. vol. 26, p. 17, section 4, it is said:

"Some governments derive a considerable revenue from a judicious exercise of the power of regulation; but, since a tax is a charge imposed for the purpose of raising revenue, a charge primarily imposed for the purpose of regulation is not a tax, and is not subject to the constitutional limitations upon the power of taxation. Thus, when the legislature desires to place some limit upon the number of people who will engage in a particular occupation, which if carried on without restraint as to numbers will be injurious to the public welfare, or wishes

State v. Anderson.

to restrict the frequency with which some act will be performed, without prohibiting it altogether, it often imposes a charge or fee upon those engaging in the occupation of performing the act. If the primary purpose of the legislature in imposing such a charge is to regulate the occupation or the act, the charge is not a tax, even if it produces revenue for the public. If, however, the primary purpose of such a charge is revenue, it is a tax, and is subject to the limitations upon the power of taxation, and not to the limitations upon the power of regulation. A characteristic example of a pecuniary charge imposed under the power of regulation is a license fee imposed by a State under its general police powers upon acts or occupations which unless controlled are hurtful to the public health, safety, or morals. Thus a high liquor license fee is not a tax. So also a license fee for the keeping of dogs is not a tax."

In *Litchville* v. *Hanson,* 19 N. D., 672, 124 N. W., 1119, Ann. Cas., 1912D, 876, it was held that municipal corporations may levy a tax on the privilege of keeping dogs; that such a tax is not assessed by valuation, but is a specific assessment, to be regarded as a license; that it cannot be regarded as a tax on property within the act exempting personal property from taxation; that it is a special privilege tax, a special and peculiar regulation for the purpose of repressing mischief likely to be done by them to more valuable property and to persons.

In discussing this question the court said:

"It is not a charge on property to raise a revenue, but is in the nature of a license under a special police

regulation, and is a constitutional exercise of the police power"—citing 2 Desty on Taxation, p. 1403; *Carthage v. Rhodes,* 101 Mo., 175, 14 S. W., 181, 9 L. R. A., 352; *Blair* v. *Forehand,* 100 Mass., 136, 97 Am. Dec., 82, 1 Am. Rep., 94; *Faribault* v. *Wilson,* 34 Minn., 254, 25 N. W., 449; *Cranston* v. *Augusta,* 61 Ga., 573; *Woolf* v. *Chalker,* 31 Conn., 121, 81 Am. Dec., 175; *Hendrie* v. *Kalthoff,* 48 Mich., 306, 12 N. W., 191.

In *Carthage* v. *Rhodes, supra,* the court said:

"Taxation may be for the purpose of raising revenue, or for the purpose of regulation. Where for the purpose of regulation, it is an exercise of the police power of the State. They are both distinct, coexistent powers in the State, and either or both may be exercised through a municipal corporation. In this case, by the terms of the charter, both powers are granted to the city of Carthage as to the dogs of that city. The dog license tax required by its ordinances is easily referable to the exercise of the police power granted. While, in a sense, dogs are property, and the owner may invoke the aid of the law for their protection as property by civil action, and by statute they have been made the subject of larceny, yet they are a base sort of property, having no market or assessable value, do not enter into the estimate of the appreciable wealth of the State, and never have been considered proper subjects of taxation for revenue. On the other hand, their almost utter worthlessness in a crowded city for any purpose except to please the whim or caprice of their owners, the half savage nature and predatory disposition of so many of them, rendering them destructive of animals of real

value, and their liability to the fatal malady of hydrophobia, which in so many instances has sent them abroad as messengers of death to man and beast, point them out as subjects peculiarly fit for police regulation."

The court, continuing, said: "That female dogs are charged a higher license fee than male dogs does not make the ordinance invalid."

Additional authorities which hold that an imposition of a license fee for the keeping of dogs *is not a tax, but is merely a fee* for the purpose of regulation, are as follows: *Gibson* v. *Harrison,* 69 Ark., 385, 63 S. W., 999, 54 L. R. A., 268; *Griggs* v. *Macon,* 103 Ga., 602, 30 S. E., 561, 68 Am St. Rep., 134; *State* v. *Topeka,* 36 Kan., 76, 12 Pac., 310, 59 Am. Rep., 529. (The italics are ours.)

In R. C. L, vol. 17, section 59, it is said: "If from a consideration of an ordinance or law it is clear that it was primarily designed as a means of raising revenue, the burden thus imposed must be treated as a tax, and not a license; and such an enactment cannot be considered as an exercise of the police power. Yet revenue may incidentally result from an undisputed exercise of the police power. Indeed, such is usually the result of police regulations, whether made directly by the legislature, or by a municipality acting under authority of law. But that fact does not divest the regulation of its police character and render it an exercise of the taxing power."

The act in question was passed by the legislature to regulate the keeping of dogs, because that animal is regarded as dangerous to the safety of persons and property owing to their vicious propensities, and their being

144 Tenn.—37

subject to a contagious malady known as hydrophobia. In regulating such a dangerous agency, the levying of a license fee or tax is not only intended to cover the cost of issuing the license and the expense of regulation, but it is also intended to be sufficiently large to prevent or discourage the keeping of such animals.

In the case of *Indianapolis* v. *Bieler*, 138 Ind., 38, 36 N. E., 857, a municipal ordinance was involved which levied a license fee of $1,000 upon a foreign brewing company maintaining a depot for distributing beer within the limits of such municipality. It was urged that because the cost of issuing the license was small, and because the expense to the city of the regulation of the business was but little, the tax was for revenue, and not a police regulation.

The court, however, said that this was to misapprehend wholly the purpose of this class of legislation; the ordinance, being an exercise of the police power, expressly granted to the city by the legislature in restraint of the occupation which the law regards as harmful to society, was within the discretion of the city authorities.

To the same effect is the holding of the court in the cases of *Duluth Brewing Co.* v. *Superior*, 123 Fed., 356, 59 C. C. A., 481; *United States Distilling Co.* v. *Chicago*, 112 Ill., 19, 1 N. E., 166; *Wallace* v. *Cubanola*, 70 Ark., 395, 68 S. W., 485, and *Toll* v. *Hudson*, 78 Mo., 302.

In all of these cases the court held that a license fee of $500 per annum was not sufficient in itself to show that its purpose was to raise revenue, and not to regulate.

There is a marked distinction between the rules applying to license fees imposed upon useful and beneficial occupations, which the sovereignty wishes to regulate, but not restrict, and those which are inimical and dangerous to public health, and to the safety of persons and property.

In the cases of *State* v. *Erwin,* 139 Tenn., 341, 200 S. W., 973, and *Ponder* v. *State,* 141 Tenn., 481, 212 S. W., 417, this court had under consideration statutes similar to each other and similar to the one now under consideration, each of which was described in its caption as an act to regulate the keeping of dogs, one applying to all dogs, and the other applying only to female dogs. The principal points of difference in the two statutes were that one required registration and the payment of a single fee for each dog during its lifetime, while the other required registration and the payment of an annual fee. One required that all money from the payment of such fees, after paying the expenses incident to the administration of the statute, should be turned over to the common school fund, while the other required that such money be paid into a "dog and stock" fund, the disposition of which was provided for in another statute, such disposition being similar to that provided in the act now under consideration.

In both of these cases this court held that the object of the statute was the regulation of dogs, and that the tax was only an incident to the object expressed, and was not put into the statute primarily for the purpose of raising revenue. In the last case referred to (*Ponder* v. *State*) the court said:

"These questions were ruled adversely to defendant's contention in the case of *State* v. *Erwin, supra,* the court holding that the statute involved in that case, which, in principle, is the same as the statute involved in the case under consideration, did not have for its primary object the raising of revenue, but was a police regulation, its object being to regulate dogs; that the tax was only an incident to the object expressed, and was not much more than enough to cover the cost of its execution."

The holding of this court in the two cases of *State* v. *Erwin* and *Ponder* v. *State, supra,* conclusively settle in favor of the validity of the statute now under consideration every question which is raised as to its validity, except with respect of the provisions for the disposition of the money constituting the "sheep fund."

After a careful examination of the authorities, we have been unable to find any case in which it has been held that any legislature exceeded its constitutional authority or its police power in providing for compensation to owners of sheep killed or injured by dogs out of money produced in a method similar to the method provided in the statute under consideration. The cases hereinafter cited show that a contrary view has been taken.

In *Van Horn* v. *People,* 46 Mich., 183, 9 N. W., 246, 41 Am. Rep., 160, a statute was under consideration which embodied a "scheme . . . intended to compel those who own and keep dogs to provide a common fund for repairing or at least mitigating such losses as are inflicted by those animals by wounding and destroying sheep." After stating that the proneness of dogs to such mischief was so notorious that reference

to it as a reason for the statute was useless, the court said:

"The enactment does not appear to be for revenue nor to raise money by way of tax as that expression is there made use of. . . . It is a species of legislation which pertains to another department of power, and where the State, in pursuing its duty to accommodate as far as practicable the desire and the right to keep dogs to the more beneficial right of breeding and keeping sheep, has seen fit to apply the method marked out in this statute. The act is an exertion of the police power, and no reason is perceived for denying its validity. In consequence of the acknowledged excellence of some of their traits and their remarkable attachment to mankind, and on account, at the same time, of their liability to break through all discipline and act according to their original savage nature, and because also of their liability to madness it has been customary always to make dogs the subject of special and peculiar regulations."

In that case the court further said: "As the charge laid on the owners of dogs is a pecuniary burden imposed by public authority, it partakes no doubt of the character of a tax, and for many purposes might be so spoken of without harm. But no accession of public revenue, either general or local, is authorized or aimed at. The end sought is different. The purpose is to prescribe a regulation under which dogs as animals dangerous to sheep and of far less public utility can alone be held, and which, if carried out, will tend to discourage an undue increase of dogs, and at the same time will

afford new protection against the effects of the mischief to which they are most given."

Later the Supreme Court of Michigan again considered the statute in the case of *Longyear* v. *Buck,* reported in 83 Mich., 236, 47 N. W., 234, 10 L. R. A., 43, and quoted with approval from *Van Horn* v. *People.* In this case the court overruled the contention that the license fees collected in a city where there were no sheep could not be added to a fund out of which sheep owners in adjoining territory could be compensated for injuries done to their sheep by dogs.

In *Mitchell* v. *Williams, supra,* a statute entitled "an act to discourage the keeping of useless and sheep killing dogs, and providing penalties for the violation of any of the provisions of said act, by officers and others," etc., was considered. The Supreme Court of Indiana, in passing upon the validity of said statute, said:

"The plain purpose and intent of this act is, not to provide a revenue for public uses, but to discourage the keeping of dogs, and indicating it to be the policy of the State to protect one species of valuable property from destruction by another species, which is in terms declared useless. That, as a measure of internal police, the legislature has the power to encourage the rearing of sheep, and, with that object in view, to discourage the keeping of dogs, animals which are not even the subject of larceny at common law, cannot be doubted. In *Thorpe* v. *Rutland & Burlington Railway Co.,* 27 Vt., 140, it was held that 'this police power of the State extends to the protection of the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property

within the State.' Nor can it be denied that the means adopted are legitimate to secure the end in view. It is a matter of no consequence how the sum charged to the owner of a dog may be collected. If it be deemed more convenient to place it upon the tax duplicate, it does not therefore make it a tax, and subject to the constitutional objection."

In *Cole* v. *Hall*, 103 Ill., 30, a similar statute to the one under consideration was considered and passed on. The court in that case said:

"It would seem it can make no difference what disposition is made of the 'license fee' when collected. By the provisions of the act it is appropriated as indemnity to persons that have sustained damage done by dogs, other than their own, to sheep, and that would appear to be in the interest of justice and right. No better disposition could be made of it."

In *Holst* v. *Roe, supra,* the court, after referring to the characteristic traits of dogs as inimical to the "important industry of raising sheep and wool," and quoting approvingly from *Van Horn* v. *State, supra,* said:

"If the government were powerless to protect this industry from the ravages of dogs, it would indeed be impotent to protect its citizens in the enjoyment of property, than which none other is more essential to the public welfare."

A similar statute was held to be constitutional by the Court of Appeals of Kentucky in the case of *McGlone* v. *Womack,* reported in 129 Ky., 274, 111 S. W., 688, 33 Ky. Law. Rep., 811, 17 L. R. A. (N. S.), 855. The court, after holding that the purpose of the statute was

not to provide revenue, but an exercise of the police power, said:

"As we view it, the statute does not confer any special privilege on the owners of sheep. It merely protects these owners from the destruction of their property by dogs. It is the duty of the State to protect every citizen in his life, liberty, and property; and it certainly is within the competency of the legislature to exercise the police power of the State to protect all property against the ravages of destructive animals. The question as to how this is to be done and what property is to be so protected is a matter of legislative discretion. Undoubtedly the sheep industry is a most important one to the whole State. All of our citizens are interested in an industry which supplies the market with wholesome meat, provides means of obtaining warm and comfortable clothing, and at the same time furnishes labor to the otherwise unemployed. It is only necessary to allude to this phase of the question. The importance of the industry as a whole is most obvious. It is equally obvious that sheep are peculiarly liable to the ravages of dogs. They have neither the fleetness to escape nor the courage to defend themselves from attack, and their silent suffering enables the dog to prey upon them without any danger that the owner will be warned of the destruction of his property by the outcry of the dying animal. No other domestic animal that we can call to mind is so liable to destruction by dogs as the sheep. It therefore seems to us clearly the duty of the State, if the furtherance of the sheep industry is a desirable end, to so regulate the ownership of dogs as

to protect the sheep from destruction by these animals. The statute is certainly a reasonable one, and lays only a small burden upon the owner of each dog; and, in effect, it only requires the owner to make good the damage done by his property. The fact that sheep are generally killed at night when it is impossible to ascertain the owner of the dog committing the ravage makes it necessary, if protection is to be had through this channel at all, that each owner of a dog should be required to contribute a small amount to a common fund dedicated to the remuneration of owners of sheep killed by unknown dogs. As said before, this is simply requiring the owners of dogs to make good the ravages of dangerous animals kept by them; and no citizen has just cause of complaint, if he keeps animals destructive to the property of others, that he is required to make good the damages done by them. The statute, in truth, is but an enforcement of the maxim, '*Sic utere tuo ut alienum non laedas,*' and, as such, its constitutionality is beyond successful question.''

In the case of *Noble State Bank* v. *N. C. Haskell,* 219 U. S., 104, 31 Sup. Ct., 186, 55 L. Ed., 112, 32 L. R. A. (N. S.), 1062, Ann. Cas., 1912A, 487, the validity of a statute of the State of Oklahoma was upheld which authorized the levy and collection of an assessment on every bank existing under the law of that State of one per cent. of the banks' average daily deposits for the purpose of creating a depositors' guaranty fund to secure the full repayment of deposits in case it or any other bank existing under the State laws should become insolvent, upon the idea that such a statute was a valid

exercise of the police power of the State and subserved the public welfare.

We are of the opinion that the cases herein cited furnish sufficient authority, as well as just and sufficient reasons, to warrant this court in holding that the statute under consideration was a valid enactment. It has been suggested that the act does not provide that the cost of its administration shall be paid out of the fund derived from its execution, but that this burden must necessarily be borne by the public revenues of the State. This suggestion may be answered by saying that there is no authority, either express or implied, given in the act to pay any part of the cost of its administration out of the public revenues of the State. The act expressly provides that the fee of the assessor for assessing and collecting the tax on each dog shall be paid out of the tax collected. We think authority may be implied from the provisions of the act for the payment of the cost of the record book which he is required to keep, and the cost of the receipts and metal tags which he is required to furnish each person paying his dog tax, out of the fund derived from the collection of the license fees. Certainly the act does not provide for the payment of any of these expenses out of the public revenues.

Without further elaboration, we hold that the statute is valid, and that the court below committed error in quashing the indictment against the defendant, and the judgment will be reversed, and the case remanded for further proceedings.

State v. Anderson.

It is quite probable, in view of the fact that a doubt has existed in the minds of some of the circuit and criminal judges of the State, and of some members of the profession, as to the validity of the act, that many persons have not paid their dog tax, and some have been indicted for not doing so. We recommend to the circuit and criminal judges of the State that, where persons have been indicted for not paying such tax, such indictments be nollied upon the payment of said tax and the costs.

L. D. SMITH, Special Judge (dissenting).

I am unable to concur in the conclusions reached by the majority of the court upholding the constitutionality of the statute which is the basis of the indictment in this case. Feeling as I do that some of the safeguards of the rights of the citizens of the State, under our Constitution, are invaded by the legislative enactment involved herein, I am constrained to put in writing the reasons for my dissenting views.

I recognize the right and the power of the legislature to regulate the business of owning and keeping dogs, and that it may, without violating any of the provisions of our Constitution, require the payment of a license fee by those who own and keep dogs, but I deny that it has any power under the guise of police regulations to impose a tax for revenue and devote that revenue to any other than a public purpose, and I maintain that this is what the act in question does.

Under the view of the majority of the court, the legislature may exact any amount of revenue under its police

powers without reference to the limitations on the taxing power of the legislature described by the Constitution, and devote that revenue to any purpose whatsoever; the argument being that the legislature may regulate the business of owning and keeping dogs by the imposition of a tax, whether that tax be imposed according to the Constitution or not, and, having that power, it may make any disposition of the revenue derived therefrom.

The real purpose of the act in question is not disclosed in the caption thereof. It purports to be an act to regulate the owning, keeping, or harboring of dogs, and to provide a license fee for each dog owned, kept, or harbored, and for the disposition of such fees. It does not disclose the fact that under the provisions of the act itself every cent of the so-called license fee of $3 for a female dog and $1 for a male dog, except the sum of fifteen cents to the tax assessor, is to be devoted to the primary purpose of creating what is called in the act a "sheep fund," to be used for the payment of damages sustained by sheep owners. Nor does it disclose the further fact that all fines belonging to the county, where such fines have been assessed, shall likewise be placed to the credit of the "sheep fund," and that this "sheep fund" is to be given over to that limited number of citizens who may happen to sustain damages by reason of the ravages of dogs upon sheep.

I do not question the proposition that, because revenue may incidentally result from the imposition of a license fee, that fact does not make the law one for revenue. But, where the license fee or charge levied as a license,

or a specified portion thereof (in this case all of it except fifteen cents), together with all fines and penalties derived from the enforcement of the law, are altogether devoted to the purpose of creating a fund, whatever disposition may be made of it, it cannot be said to be merely incidental. And I question the right of the legislature to devote revenue, whether derived directly in accordance with the tax provisions of the Constitution, or under the police power, or under any other power imaginable, to any other use or purpose than for the public purposes prescribed by our Constitution.

It is conceded by the majority opinion that, if the fee prescribed by the act is a tax, then the act is unconstitutional. Whether it is a tax or not, it must be conceded, is not to be determined from the mere terms used in defining or describing it. We may look to the whole act and ascertain therefrom whether the license fee be a tax or whether it be a mere license fee. The act denominates the charge as being a license fee.

Section 1 of the act provides that every person keeping a dog shall pay "as an annual license fee to the county assessor or county trustee the sum of $1 for each male dog or spayed female dog, more than six months of age so owned, harbored or kept, and the sum of $3 for each and every female (unspayed) dog, more than six months of age, so owned, harbored or kept."

Section 2 then requires the county assessor to give a receipt for money paid him, and that this receipt shall be designated as a dog license. The assessor is required to take a record of persons owning dogs, and a copy of the receipt be given to each owner, setting forth the num-

ber of dogs, name, age, sex, and breed of the dogs, and the amount paid to him.

Section 3 provides that the money collected by the tax assessor is to be delivered to the county trustee.

Section 4 prescribes that any person keeping a dog who shall have failed to pay the license fee within thirty days, upon demand of payment by the county assessor, shall be guilty of a misdemeanor, and upon conviction shall be fined not less than $10 nor more than $50 by the court having jurisdiction thereof.

Section 5 makes it the duty of the assessor to report all the information obtained to the county trustee, and the trustee is required to report all such information to the district attorney-general, whose duty it is made to prosecute any persons violating the provisions of the law. If it so happens that the criminal court is not in session, then a warrant must be sworn out against the delinquent, and prosecuted before a justice of the peace. All funds collected for violations of the act shall be turned over to the county trustee, to be held by him as a part of the "sheep fund," afterwards in the act provided for.

Section 6 provides that any trustee or assessor or other person upon whom is enjoined any of the duties prescribed by the act shall be deemed guilty of a misdemeanor in office for violation thereof.

Section 7 provides that every person liable to taxation must make and subscribe to an oath to the county assessor stating the number of dogs, whether male or female, and, if female, whether spayed or unspayed, over the age of six months, kept by him, and, if any person make a false statement, he is deemed guilty of per-

jury, and upon conviction thereof shall be punished by law for that offense.

By section 8 it is provided that any person who owns or keeps a dog after he knows that the dog has killed, maimed, chased, or worried sheep shall be guilty of a misdemeanor, and upon conviction thereof shall be fined not less than $10 nor more than $50.

By section 9 it is made a misdemeanor for any person to keep or harbor a dog who has not paid the tax assessor or county trustee the required license fee, and upon conviction they shall be fined not less than $10 nor more than $50.

By section 10 it is declared a misdemeanor for a person owning or keeping a female dog to permit it to run at large when in heat, after he knows such dog to be in heat, and upon conviction thereof shall be fined not less than $10 nor more than $50.

All the revenue derived from violations of the law by means of the fines and penalties just described, as well as the license fee, shall constitute a fund known as the "sheep fund."

Section 11 provides: "Sec. 11. Be it further enacted, that all money derived by the licensing of dogs, collected by the county assessor or county trustee, as provided by this act, shall constitute a fund known as the 'Sheep Fund,' which shall be kept by the county trustee and used for the payment of damages sustained by sheep owners of sheep killed, maimed or damaged by any dog or dogs within any county of the State of Tennessee, and each county trustee shall collect all fines belonging to his county from the respective courts where such fines have

been assessed under the provisions of this act, and all such fines shall be placed to the credit of the 'sheep fund,' as herein provided for.''

Thus it will be seen a scheme is devised for the production of a large revenue to make up a fund from which sheep owners may be compensated for their personal losses by the ravages of dogs. Not even the expense of the administration of the enforcement of the law is taken care of out of the license fee, or from any other source. This burden must necessarily be borne by the public revenues of the State, with the single exception of fifteen cents to the tax assessor for assessing and collecting the tax. Even the expense incident to the cost of the record book required to be kept, the cost of the receipts, and every other expense and charge fixed in the act, except the fee of fifteen cents and the cost of a metal tag which is to be borne by the dog owner, must come from the public revenues.

By the opinion of the majority it is said that the act does not provide for the payment of any of these expenses out of the public revenues. To be sure it does not, but all these expenses, the costs of witnesses, the fees of officers, and every other item of expense connected with the enforcement of the law has to be paid, and the State is deprived by this act of any of the funds derived from the license fee, or from fines, with which to pay this expense, but devotes it to the private purpose of indemnifying the sheep owner. In this roundabout way the public is made to pay the costs and expenses incident to this law out of funds which it would otherwise be entitled to devote to public purposes, in order to pro-

tect a private industry. This violation of the rights of the citizens cannot be justified merely because, if this sheep fund is not exhausted in the payment of private claims, it may be devoted to the public school fund.

Can it be said that a charge thus imposed upon the owners of dogs is one for the primary purpose of regulating the dog industry, and not a tax within the meaning of our Constitution?

Taxes have been variously defined. Practically all of the definitions given by the courts are stated in 37 Cyc., pp. 706-708, as follows:

"The terms 'tax' and 'taxes' have been defined as a rate or sum of money assessed on the person or property of a citizen by government for the use of the nation or State; burdens or charges imposed by the legislative power upon persons or property to raise money for public purposes, and the enforced proportional contribution of persons and property levied by authority of the State for the support of government and for all public needs. Taxation is the act of laying a tax, or imposing these burdens or charges upon persons or property, or, in other words, the process or means by which the taxing power is exercised. Other definitions relating to taxes and taxation are given in the notes and subsequent sections of this article.

"In a general sense the terms 'tax' and 'taxes' include every burden that may be lawfully laid upon the citizen by virtue of the taxing power, but their application in constitutional or statutory provisions, varies to some extent according to the intention and purpose of the particular provision, and even the fact that a burden is

imposed in the exercise of the taxing power does not necessarily make it a tax. The essential characteristics of a tax are that it is not a voluntary payment or donation, but an enforced contribution, exacted pursuant to legislative authority, in the exercise of the taxing power, the contribution being of a proportionate character, and payable in money, and imposed, levied, and collected for the purpose of raising revenue, to be used for public or governmental purposes, and not as payment for some special privilege granted or service rendered. Taxes and taxation are therefore distinguishable from various other contributions, charges, or burdens paid or imposed for particular purposes or under particular powers or functions of the government. Whether a particular contribution, charge, or burden is to be regarded as a tax depends upon its real nature in view of these essential characteristics, and, if it is in its nature a tax, it is not material that it may be called by a different name, and conversely, if it is not in its nature a tax, it is not material that it may have been so called.'' 37 Cyc., pp. 706-710.

Unquestionably the license fee prescribed in this act is a burden laid upon the citizen who happens to be the owner of a particular class of property, and the object and purpose of levying the tax or charge is to create a fund to be used for governmental purposes. Of course, the fact that this fund is devoted to an unlawful purpose cannot relieve it of the characteristics of a tax, because whatever purpose the legislature may express is a governmental purpose, whether constitutional or not, within the definition of the term taxation.

State v. Anderson.

It is a settled rule of law that no legislative body can impose a license tax for revenue purposes under the guise of the police power, and it is equally well settled that a license fee required of useful employments can carry with it only such fee as is necessary to pay the expenses of licensing, including reasonable compensation for the additional expense of supervision over the particular vocation, except, of course, the legislature cannot be expected to anticipate the exact amount of the expense to be incurred, and therefore any surplus derived from a reasonable exercise of legislative power may be devoted to some other purpose without infringing the taxation provisions of the Constitution.

It is practically conceded by the opinion of the majority that, if the keeping of dogs were a useful employment, then any license fee charged must be such and no more as to reasonably meet the additional expenses incurred by the State in the enforcement and administration of the law. It has been too universally decided to admit of contrary argument that any license fee which is unreasonably in excess of the estimated expense occasioned by any particular line of business constitutes a tax, and not a license fee, and of course it follows that, where the license fee is specifically devoted to some other purpose it is a tax and not an exercise of the police power. 17 Ruling Case Law, pp. 532, 539, 543.

I quote from the above authority not so much for the purpose of showing what the decisions have been as to present in concrete form the reasons for the proposition that, when a burden or charge is levied against a citizen or a property holder beyond that which

is reasonable for covering the expense of the enforcement of the law, and certainly when it is devoted to an entirely different purpose, it becomes a tax, and the power to enforce its collection depends upon whether it has been levied in accordance with the limitations of the Constitution.

"It is a rule of wide acceptation that a municipal corporation cannot, under the guise of the police power, impose a license tax for revenue purposes. If from a consideration of an ordinance or law it is clear that it was primarily designed as a means of raising revenue, the burden thus imposed must be treated as a tax, and not a license, and such an enactment cannot be considered as an exercise of the police power. Yet revenue may incidentally result from an undisputed exercise of the police power. Indeed, such is usually the result of police regulations, whether made directly by the legislature, or by a municipality acting under authority of law. But that fact does not divest the regulation of its police character and render it an exercise of the taxing power. While it is no objection to a tax imposed under the police power that it may incidentally yield a revenue, still the tax cannot be made so heavy on a legitimate occupation as to create a monopoly, or, in effect, prohibit the pursuit of the occupation. The amount of the license fee or charge is to be considered in determining whether the exaction is one for regulation merely, or for revenue, the reason being that the amount of the fee might in some cases be so large as to suggest of itself, considering the character of the business to which it was applied, that it was in fact a tax for revenue." 17 R. C. L., p. 543, section 59.

Of course, if a license fee or charge could be held to be a tax, by reason of the excessive amount of the fee or charge, there is no escape from the conclusion that, if the tax by the act is devoted to other purposes, and certainly when devoted to a govermental purpose, it becomes a tax that must conform to the limitations of the Constitution.

Again quoting from Ruling Case Law:

"It is well settled that the license required of useful employments can carry with it only such fee as is necessary to pay the expenses of licensing, including reasonable compensation for the additional expense of municipal supervision over the particular business or vocation; whereas the exaction of license fees for revenue purposes is the exercise of the power of taxation, and, as such, comes within the provisions of the constitution limiting the exercise of that power." 17 R. C. L., p. 533, section 50.

Again quoting from Ruling Case Law:

"It is a well-settled rule in may jurisdictions that a license fee may be of sufficient amount to include the expense of issuing the license and the cost of the necessary inspection or police surveillance connected with the business or calling licensed, and that the exaction of sums in excess of such expenses is, in effect, nothing else than a tax on the business. But where the ordinance conforms to the rule, charges thus imposed are in no sense a tax, fine, or penalty, but a legitimate fee charged for services rendered, including the expenses which may be incurred in the enforcement of such police inspections or superintendence as may be lawfully exercised over the

business. Under this rule, in fixing the fee it is proper and reasonable, however, to take into account not only the expense of, direct regulation, but all the incidental consequences that may be likely to subject the public to cost in consequence of the business licensed. As a general rule, at least with reference to employments not requiring restraint, a fee which is disproportionate to the cost of regulation will be deemed unreasonable; and so it has been held that, if there is no inspection or supervision by the municipality, there can be no license fee impose." R. C. L., section 56, p. 539.

It may be well to notice some of the cases in which the courts of this country have made the distinction between a mere license fee and a tax:

The case of *Ellis* v. *Frazier,* 38 Or., 462, 63 Pac., 642, 53 L. R., A., 454, was one involving a statute imposing a tax on bicycles, to be used for the construction of bicycle paths, and in which the act was held to contravene a constitutional provision against special or local laws for laying, opening, or working highways. The act set apart four-fifths of the tax as a fund for the purpose of constructing and maintaining bicycle paths, and this fact was held to show that the statute was primarily designed as a means of raising revenue, and the burden imposed must be treated as a tax, and not a license. In discussing the question the court said:

"The legislative assembly has referred to the levy as a tax, but the descriptive designation is unimportant; for the object sought to be obtained by the enactment must determine the character of the exaction."

The court quoted from Cooley on Taxation at page 396, wherein that author said:

"The distinction between a demand of money under the police power and one made under the power to tax is not so much one of form as of substance. The proceedings may be the same in the two cases, though the purpose is essentially different; one is made for regulation and the other for revenue. If, therefore, the purpose is evident in any particular instance, there could be no difficulty in classifying the case and referring it to the proper power."

The court approved a quotation from another case in which it was held:

"Whenever it is manifest that the fee for a license to conduct an occupation is substantially in excess of the sum necessary to cover the cost of issuing the license and incidental expenses attending the regulation of the business, the burden is a tax, and not a license."

After quoting the above, the court said, with respect to the particular statute involved therein:

"Whatever the rule may be in respect to the granting of licenses which incidentally result in producing a revenue, or the law in relation to the authority of a municipal corporation in the maintenance of its streets, it cannot reasonably be inferred that the burden imposed by the act in question was an exercise of the police power of the State; for the use of a bicycle does not necessarily tend to the destruction of the highways. We do not wish to be understood as intimating that the sum of $1 more than the cost of executing the necessary receipts and supplying the requisite tags is an unreasonable exaction,

but, inasmuch as that sum is set apart from each collection as a fund for the purpose of constructing and maintaining bicycle paths, it is evident, we think, from a consideration of the entire act, that it was primarily designed as a means of raising revenue, and the burden thus imposed must therefore be treated as a tax, and not a license."

In the case of *Wisconsin Telephone Co.* v. *City of Milwaukee,* 126 Wis., 1, 104 N. W., 1009, 1 L. R. A. (N. S.), 587, 110 Am. St. Rep., 886, it was held that the power to exact from the telephone company, authorized by statute to erect its lines in the streets of the city, a license for the use of such streets, is not given to a municipal corporation by a charter conferring upon it general police power and right to control and regulate its streets and to prevent the incumbering of them. The act involved in that case required the payment by the persons erecting poles of an annual license fee of $1 for every pole, and the funds derived from such license were to be credited to and become a part of the general city fund. The court said:

"The plain import of this ordinance is that it grants the privilege to telephone and telegraph companies to occupy the streets of defendant city with their poles . . . in consideration of the license fee exacted. . . . There is nothing in the ordinance indicating that the fee is exacted for inspection or supervision, or that it will be used for such purpose, or that any such amount is necessary to defray the expense of such inspection and supervision. . . . Even if the city had the right to impose reasonable charges for inspection and super-

vision, it should not be permitted, under the guise of such power, to collect large amounts of revenue for the benefit of the city, regardless of the amount necessary for such inspection and supervision.''

In the case of *Ottumwa* v. *Zekind*, 95 Iowa, 176, 63 N. W., 672, 29 L. R. A., 735, the court said:

'' 'Licenses are a part of the police regulations of a city, and should be charged for as such and only to such extent as may reasonably compensate the city for issuing and enforcing the licenses, and for the care exercised by the city under its police authority over the particular person licensed.' . . . The amount of the license fee or charge is to be considered in determining whether the exaction is not . . . one of revenue or prohibition instead of one of regulation under the police power.''

The case of *American Fertilizer Co.* v. *Board of Agriculture of North Carolina* (C. C.), 43 Fed., 609, 11 L. R. A., 179, involved the constitutionality of an act of the legislature of North Carolina to the effect that no commercial fertilizers should be sold or offered for sale until the manufacturer or importer obtained a license from the State, for which he should pay a privilege tax of $500 per annum, for each separate brand. The court recognized the right of the State to tax any person for the privilege or doing any particular business therein, under the authority of *McCullough* v. *Maryland*, 17 U. S. (4 Wheat.), 316, 4 L. Ed., 579; but this statute was challenged upon the ground that it imposed a tax on fertilizers. The court said:

''If the legislation . . . can properly be referred to'' the police ''power, it will be because the right to

pass inspection laws may be deemed to have its founda-
tion in the police power of a State. Certainly if it be
anything but what the act itself seemed to contemplate—a
tax on an occupation or a privilege tax—it is because it
is used to secure an inspection of commercial fertilizers
before they can be sold in North Carolina. Such a tax
would be constitutional only within the limits of the Con-
stitution. It cannot be sustained when evidently in
excess of what is required for such purpose, and when
the proceeds are applied to other uses.

"We think that in this case the court might judically
take notice of the evident fact that $500 on a brand of
commercial fertilizers is a much larger sum than can
be necessary for its inspection. But the court is relieved
from all embarrassment in this respect by the fact that
the act declares, by necessary implication, that the tax
is not needed for inspection expenses. In section 22
$500 of the money received from the tax on fertilizers is
appropriated to the North Carolina Industrial Associa-
tion, and in section 23 $41,000 is given to pay the expenses
of the department of agriculture, including $20,000 for
the completion of the oyster survey, and 'all other
revenues arising from the tax on fertilizers' are 'ap-
propriated to the establishment of an agricultural and
mechanical college.' "

The difference between a tax and a license fee is clearly
expressed by this court in *McMillan* v. *City of Knoxville,*
139 Tenn., 324, 202 S. W., 65, and it was therein recog-
nized that a license fee is one that covers the expenses
incident to its issuance and the expenses incident to the
supervision of the particular business being regulated.
The court said:

"A 'license,' in its truer sense, is issued under the police power, while a license may be issued on the payment of an 'occupation tax,' levied under this taxing power embodied in the Constitution, revenue being its primary object, though regulation may be in mind as an incident. The two charges and licenses are distinct things, but confusion of thought arises at times, due to the fact that a license may be issued in either case. In the one case the power exercised is that to license, and in the other to tax and to license. 3 McQuillin, Mun. Corp., section 961.

"Judge COOLEY says that under the authority to license in the truer sense 'a municipal corporation may by ordinance require a license to be first taken out, and charge a reasonable sum for issuing the same, and keeping the necessary record, but it cannot, by virtue of this authority, without more, levy a tax upon an occupation itself.' *Mayor of Nashville* v. *Linck*, 12 Lea (80 Tenn.), 507. A license in this sense is a permit issued not for revenue, but for regulation. As said, an occupation tax is levied for revenue primarily, and, in instances, for regulation incidentally.

"We are of the opinion that it was competent for the legislature to provide a regulatory license for, and also an occupation tax upon, such agencies. The two are not inconsistent; neither impinges on the other. 17 R. C. L., p. 486. Therefore the enactment of chapter 78 did not repeal chapter 70 of the Acts of 1917.

"It was competent for the legislature to add to whatever regulation was manifested in the imposition of the privilege or occupation tax, by providing for the more

detailed policing regulation set forth in Acts 1917, chapter 78, and to fix a fee therefor.

"A true license fee, as contradistinguished from such a tax, should be fixed to cover the expense of issuing it, the service of officers, and other expenses directly or indirectly incident to the supervision of the particular business or vocation. There is no attempt in this case to question the amount of the license fee as being excessive or so unreasonable as to partake of the nature of a tax. *Ex parte Cramer,* 62 Tex. Cr. R., 11, 136 S. W., 61, 36 L. R. A. (N. S.), 78, Ann. Cas., 1913C, 588."

In *Postal Telegraph Co.* v. *Taylor,* 192 U. S., 64, 24 Sup. Ct., 208, 48 L. Ed., 342, there was involved an ordinance imposing a license tax or fee upon telegraph companies having poles and wires in the borough.

The license fee charged was held to be a tax because it was twenty times more than could possibly be incidental to inspection and supervision. The ordinance was held to be unreasonable, although it was urged by the municipality that it was a proper police regulation, and that the collection of the revenue was but incidental to the protection of the lives and property of its citizens. In passing upon the validity of the ordinance, the court said:

"When we come to an examination of the grounds upon which this kind of a tax is justifiable, and when we find that in this case each one of those grounds is absent, how is it possible to uphold the validity of such an ordinance? To uphold it in such a case as this is to say that it may be passed for one purpose and used for another; passed as a police inspection measure and

State v. Anderson.

used for the purpose of raising revenue; that the enactment as a police measure may be used as a mere subterfuge for the purpose of raising revenue, and yet, because it is said to be an inspection measure, the court must take it as such and hold it valid, although resulting in a rate of taxation which, if carried out throughout the country, would bankrupt the company were it added to the other taxes properly assessed for revenue and paid by the company.''

For similar reasons the supreme court of the United States in the case of *A. & P. Telegraph Co.* v. *Philadelphia,* 190 U. S., 160, 23 Sup. Ct., 817, 47 L. Ed., 995, held that an ordinance requiring the company to pay a license fee for the supervision of its business was subject to some restraint in the amount of the charge which it exacts The court said:

''When it is authorized only in support of police supervision, the expense of such supervision determines the amount of the charge, and, if it were possible to prove in advance the exact cost, that would be the limit of the charge. In the nature of things that, however, is ordinarily impossible, and so the municipality is at liberty to make the charge large enough to cover any reasonable anticipated expenses. It is authorized to fix such charge in advance, and need not wait until the end of the period for which the license is granted. It may not act arbitrarily or unreasonably, but the risk may rightfully be cast upon the licensee.''

The majority opinion would seem to make a distinction between license fees charged upon useful employments and these employments which are deemed detrimental

to the public health, and that therefore the legislature may in the exercise of its police power, and without conformity to the limitations of the Constitution with respect to taxation, raise any amount of revenue from a person engaged in an employment deemed by the legislature to be detrimental to the public morals or the public health, and that by means of the license fee the legislature may prohibit or restrain such a business even though it results in the production of a revenue.

Unquestionably the legislature has the power if it exercises it in accordance with the limitations of the Constitution to tax undesirable occupations to the point of prohibition. It may exercise its police power through the method of taxation, but it cannot exercise its police power in violation of the mandates of the Constitution. If the legislature sees fit to prohibit or restrain the keeping of dogs, by means of a tax, then it must conform to the provisions of the Constitution on that subject. The exercise of the police power is not an unrestrained one. It cannot be exercised in violation of plain inhibitions in the Constitution. When a legislature invokes its taxing power to further police regulations, it must comply with the restrictions of the Constitution in that respect. Our legislature is authorized by the Constitution to levy a tax upon privileges. This power cannot be used to prohibit useful occupations, because the police power cannot be combined with the taxation power to destroy or to restrain useful employments. In such case the amount of the privilege tax must be a reasonable one. But, in the case of those employments deemed detrimental to the public health or to the public morals, the

State v. Anderson.

legislature may combine its taxing power with its police power, and impose a privilege tax which would operate as a regulatory measure under its police power. But it cannot raise revenue by taxation without complying with the provisions of our Constitution with respect thereto under the guise of the police power. Whenever it undertakes to destroy a dangerous business by the exercise of its police power, it must recognize the restraints of the Constitution. It may go to the end necessary to accomplish the purpose, provided it does not run counter to the Constitution itself. When it undertakes to utilize the taxing power, it must comply with the limitations which created the power.

I am perfectly aware of the fact that in some jurisdictions the courts have gone a long way to uphold legislation of this character. Similar statutes have been held constitutional by the Supreme Courts of Michigan, Indiana, Illinois, Ohio, and Kentucky.

In the case of *Cole* v. *Hall,* 103 Ill., 30, it seems that it would make no difference under the Constitution of that State what disposition was made of the license fee when collected.

The Oklahoma banking laws, requiring bankers to pay a tax to create a fund for the protection of those who lose their money in bank failures, are referred to.

None of these cases can possibly be in harmony with the principle that a license fee in excess of reasonable expenses for supervision, or for other purposes than supervision, is nothing but a tax, unless it be upon the principle that any amount of money can be raised for any purpose under the police power, which tends to

restrain or prohibit a business or occupation detrimental to the public health or to the public morals. It may be that the enactments in these States are in harmony with some privilege tax power conferred by the Constitution upon the legislature. I cannot agree to the soundness of any such decisions when tested by our Constitution.

I should not feel impelled to emphasize my dissent if I were convinced that this court had in previous decisions settled the question, as is stated by the opinion of the majority. While I am not prepared to concede the correctness of the decisions of this court in the case of *State v. Erwin,* 139 Tenn., 341, 200 S. W., 973, and *Ponder v. State,* 141 Tenn., 481, 212 S. W., 417, nevertheless they should be adhered to if conclusive of the question herein presented.

I recognize the soundness of the principle that the legislature is not obliged to calculate in advance the expenses incident to the administration of a law, and that it may within reasonable limitations estimate what would be a reasonable charge to meet expenses of that character, but whenever the legislature undertakes by means of a license fee to collect from property owners a fee or charge which upon its face is not intended for nor devoted to the purpose of meeting the expenses incident to the regulation, or which it can be readily ascertained is not intended for that purpose, I am obliged upon principle and authority to conclude that such a charge constitutes a tax which must be raised in the method and according to the provisions and limitations of our Constitution. I conceive such to have been the holding of this court in the case of *Phillips v. Lewis,* 3 Shan. Cas.,

State v. Anderson.

230.   In that case an act making it a privilege and im-
posing a tax thereon to keep a dog was under considera-
tion.   Its constitutionality was defended on the ground
that it was an exercise of the police power inherent in
the legislature.   In denying this contention the court
said:

"This power [the police power] is a very different
one from the taxing power, as we think, in its essential
principles, though the taxing power, when properly ex-
ercised, may indirectly tend to reach the end sought by
the other in some cases.   This power in the State is
based on the maxims that a man must so use his own
as not to do wrong to another; that the individual citi-
zen shall so enjoy his own rights as not thereby to in-
fringe upon the rights of others; that the interest and
rights of the individual, or a class of individuals, is to be
made subservient to the higher interest of the whole or
majority of the people of the State whenever the minor
interest shall conflict, in the judgment of the legislature,
with that of the greater.   .   .   .

"We will, however, from the cases before us, indicate
some of the means which have been held constitutional
and within the power of the legislature in other States
by which the ownership of property may be regulated,
and restraints fixed upon such ownership so as to pre-
vent injury to others or detriment to great public in-
terests, to which such ownership must always be held
subordinate.   Numerous instances will be found in Cool-
ey's Const. Lim., p. 595 (6th Ed. 739-741), for the prop-
er exercise of this power, and are familiar to our own
jurisprudence.   Such cases, too, as in themselves are,

144 Tenn.—39

not wrong, but are declared to be public nuisances because endangering the public health, public safety, and, we may add, the same principle applies to that which is deemed injurious to any great public interest, and this to be judged of by the legislature. Milldams may be abated or destroyed, churchyards found detrimental to the public health, or in danger of becoming so, the keeping of gunpowder in cities or villages, the sale of poisonous drugs, allowing unmuzzled dogs to be at large when danger is apprehended from hydrophobia, and, we may say, the same regulation might be applied in case of danger to any great public interest, such as sheep raising in our State. The author adds, 'and, generally, it may be said that each State has complete authority to provide for the abatement of nuisances, whether they exist by the party's fault or not.'

"In Massachusetts it has been held that a law (Acts 1867, chapter 130, section 7) was valid providing 'that any person may, and every police officer (and constable) shall kill, or cause to be killed, all dogs (whenever or) wherever found, not licensed and collared according to the requirements of a statute, and this without previous adjudication, and that an officer with a warrant for this purpose from proper authority, might even enter upon the close of an owner for this purpose.' See 100 Mass. R., 136. We may say that this decision goes too far in one aspect, and there ought to be a judgment of a court of competent jurisdiction as to the improper possession of the property before it could rightfully be destroyed.

"At any rate, from a brief summary of their results it is clear from them all that the State may declare the

State v. Anderson.

keeping of this species of property a nuisance, or limit the number to be kept, or particular species of it, with known tendencies to do injury by devouring sheep; that it may impose penalties for keeping such animals, to be enforced by a fine or otherwise, on conviction; that it may regulate the manner in which such animals shall be kept, as by forbidding them to be allowed to go at large except when in use and under the control of competent persons, or require them to be kept muzzled or collared so as to be incapable of doing mischief, and, in fact, may make whatever (character) of regulation or requirement in this direction (that may be) adequate to the end to be attained, the protection of that valuable and increasing industry, wool growing in our State.

"To devise proper means in this direction is confided to the wisdom of the legislature, representing the people and familiar with their wants. But in case of destruction of this or any other property, except in the well-known cases, recognized at common law, of great emergencies, such as the destruction of a house in a city to check the progress of a fire, etc., and under these limitations, the rule of the Constitution of our State must be followed—that is, no man shall be deprived of his life, liberty, or property but by the judgment of his peers, or the law of the land. . . .

"It will readily be seen from this review of the principles that underlie the police power, as well as the cases on the subject, that this statute is not in accord with them, so far as the provisions for taxation are concerned. In fact, the law was not framed with that view, but purely as a revenue measure, no doubt intending as

one of the results, however, to be secondary to the first, to lessen the number of dogs in this State, but this secondary end which might or might not be the result cannot bring the tax imposed within the requirements of the Constitution, and the means used are not the appropriate ones to that end.

"It is proper, perhaps, before we close, to refer to one other argument presented—that is, that our license laws in some cases, as in that of selling spirituous liquors, were intended to check its sale. This may be, and is no doubt, to some extent, a secondary result of the law, but the leading one (object) is revenue.

"But it is clear this is only an incident to such a law. We have but to look at the list of occupations made privileges to see that this is not the general object of such laws; for instance, merchants, telegraph companies, artists, and photographers. These occupations were certainly not intended to be checked or lessened by declaring them a privilege, and taxing them as such. It does not follow that, because this effect may in some degree follow, that it is the end of the law, nor that it is done in the exercise of the police power of the state, especially when we see the leading object to be revenue. But we need not further pursue this discussion. The result is that the law before us must be held void as a revenue measure or tax imposed in violation of the limitations of our Constitution, and not sustainable under the police power of the State, because not so purposed in the first place, and, second, because not using the appropriate remedies for the exercise of such power. However lightly we may esteem the animal subject to

State v. Anderson.

this tax, the Constitution of out State is not thus lightly to be esteemed, and must be held, both in great and small matters, to be the supreme law of the land."

It is true that this court in the *Erwin* Case held the Act of 1907 (Laws 1907, chapter 32) to be constitutional. That act prescribed regulations for the keeping of dogs. It prescribed a $3 fee to be paid by the owner of the dog for the registration thereof. This fee was held to be only incidental to the payment of the costs of the execution of the act. The court said:

"The object of the present act is the regulation of dogs. The tax is only an incident to the object expressed and is not much more than enough to cover the cost of its execution."

Section 9 of the Act of 1907 provided: "It shall be the duty of the circuit court clerks by the 31st day of December of each year to make up their accounts and receipts from the registry of female dogs, from which shall be deducted the cost of books, collars, tags, or other necessary expense, and a fee of fifty cents for each female dog registered, which shall be the fee or compensation of the clerk, and he shall make a report to the commissioner of agriculture by the 10th day of January of each year of the number of female dogs registered in his county the preceding year. The balance, if any, remaining in the fund shall be turned in to the county trustee, who shall receipt the clerk for the same, and place the same to the credit of the common school fund, to be prorated as other school moneys collected by such trustee."

Manifestly the purpose of this fee was to cover the costs and expenses incident to the administration of the law, and the part devoted to the school fund was simply what might remain, if any, over and above this reasonable estimate of what it would take to cover such expenses. This was manifestly in the mind of the court in the Erwin Case. Exactly the same provision is found in section 8, chapter 648, of the Private Acts of 1917, the constitutionality of which was involved in the Ponder Case.

The difference in the provisions of these latter acts and the one now under consideration constitutes the very thing which I say renders this act violative of the Constitution. In other words, whenever the legislature under the guise of a license fee fixes a tax for purposes other than those incident to the administration of the law, or unreasonably in excess thereof, the fee becomes necessarily a tax which can only be levied in the method prescribed by our Constitution.

The act in question is objectionable for the further reason that it undertakes to appropriate the funds derived by means of license fee and fines and penalties collected to a private rather than a public use.

I conceive it to be wholly immaterial whether revenue is derived under the taxing power or any other power; it cannot be devoted to any other than to the public use, under the provisions of our Constitution. I am aware of the fact that some courts have held that it is immaterial to what use the money is devoted, so that it does not arise through the exercise of the taxing power of the legislature. I cannot conceive that the property of

one citizen can be taken away from him and given to
some private industry or some private enterprise. Every
cent of money which the legislature takes from any citi-
zen under our Constitution can only be for the purpose
of devoting it to public uses. The property of a citizen
cannot even be taken away from him for public purposes
except in accordance with the constitutional guaranties.
It cannot be taken away from him by any means for
private purposes. I do not question the great importance
of the sheep industry in this State, or any other State,
nor do I question the fact that dogs are of such a nature
as that their number should be reduced, and that the
owners thereof should be compelled to make restitution
to persons injured by reason of their vicious or destruc-
tive habits, but I apprehend that the rights of the citizen
as expressed in the Constitution are of more importance
to the public than the mere proper solution of the dog
question.

In the case of *Fox* v. *Mohawk & Hudson River Humane
Society,* 165 N. Y., 517, 59 N. E., 353, 51 L. R. A., 681,
80 Am. St. Rep., 767, there was involved before the court
of New York an act entitled an act for the prevention
of cruelty to animals, and empowering certain societies
for the prevention of cruelty to animals to do certain
things. The statute provided that every person who
owns or harbors dogs within the limits of any city having
a specified population in which there exists a society
for the prevention of cruelty to animals shall procure
a yearly license for such animals and pay .$1 yearly to
such society; the said license fees to be used by said
society toward defraying the costs for carrying out the

provisions of the statute, and to secure shelter for lost, strayed, or homeless animals, and for its own purposes.

The court held that the act was unconstitutional so far as it required the owner of the dog to pay a license fee to the defendant for its own use. The court quoted from *People ex rel. Einsfeld* v. *Murray*, 149 N. Y., 374, 44 N. E., 147, 32 L. R. A., 344, in which that court said:

"No exaction can be lawfully made of a citizen by way, of tax, impost or excise, except under the authority of the legislature, and the product of such imposition is public money."

The correctness of this doctrine was said to be too clear to be questioned. "The appropriation of public money for other than strictly governmental purposes and its expenditure through other than official channels have been most carefully limited by article 8 of the Constitution."

The Constitution provided: "Neither the credit nor. the money of the state shall be given or loaned to or in aid of any citizen, corporation or private undertaking. This section shall not, however, prevent the legislature from making such provision for the education and support of the blind, the deaf and dumb, and juvenile delinquents, as to it may seem proper."

It was further provided: "No county, city, town or village shall hereafter give any money or property, or loan its money or credit to or in aid of any individual association or corporation."

With respect to these provisions of the Constitution and the act under investigation, the court said:

"By this comprehensive enumeration of money of the State, of a county, city, town, or village, it is plain that the Constitution meant to include all public moneys which are raised in any manner throughout the State as an exaction from the citizen by the taxing or licensing power of government."

Recently there was decided by the Supreme Court of the United States a case, that of *Nicchia* v. *People of State of New York,* 255 U. S., —, 41 Sup. Ct., 103, 65 L. Ed., —, having been decided at the October term, 1920, in which there was involved the constitutionality of the New York dog law. That law required every person who owns or harbors one or more dogs within the corporate limits of any city having a population of over $800,000 to procure a yearly license and pay the sum of $2 for each dog. The American Society for the Prevention of Cruelty to Animals was empowered and authorized by the act to carry out its provisions and to issue licenses and collect the fees therefor. Its constitutionality was upheld upon the ground that the license fees collected to the extent that they were not required to be used in carrying out the provisions of the act might be retained by the society as compensation for its enforcement. The court said:

"Property in dogs is of an imperfect or qualified nature, and they may be subjected to peculiar and drastic police regulations by the State without depriving their owners of any federal right. . . . Its power to require those who wish to keep dogs to secure licenses from and pay fees to a public officer is also clear. And when the State, in the reasonable conduct of its own af-

fairs, chooses to intrust the work incident to such licenses and collection of fees to a corporation created by it for the express purpose of aiding in law enforcement, and in good faith appropriates the funds so collected for payment of expenses fairly incurred and just compensation for the valuable services rendered, there is no infringement of any right guaranteed to the individual by the federal Constitution. Such action does not amount to the taking of one man's property and giving it to another, nor does it deprive dog owners of liberty without due process of law.''

The reasons assigned by Chief Justice O'REAR in his dissenting opinion in the case cited and relied upon in the majority opinion in this case, aptly expresses my views upon the right of the legislature to devote public funds derived from dog license taxes to private uses. While this opinion of Judge O'REAR is a minority opinion, it was concurred in by two of his associates, and it seems to me its logic and reasoning is unanswerable and unanswered by the opinion of the majority of the court in the present case. He expresses my views so well that I quote his opinion in full:

''O'REAR, C. J. (dissenting). While admitting the scope of the police power in the State to regulate the ownership and control of property within its borders so as to minimize the injuries that may be inflicted on others because of the predatory nature of the property, still I am unable to go so far as the majority opinion does in this case. One man's property may need regulation for the public safety, but that is far from meaning that it may be taken from him and given to somebody else.

Admitting that the legislature has the power to impose a tax upon dogs as a police regulation, the tax cannot be imposed, in my judgment, for the benefit of a few persons, or for any special class of persons, for the State is as powerless to take one citizen's property and confer it upon another, under the guise of police regulation, as it is under the tax regulation. By whatever name you call the act, it is the same, if the inevitable result is the same. It could not be maintained that a tax could be levied upon sheep, and the sum realized given over to those who raise horses alone, upon the idea that the horse-raising industry was of more benefit to the State than sheep husbandry. Nor would the fact that the State could appropriate its general revenues to fairs at which horses alone were exhibited as a means of stimulating an enterprise that would be beneficial to the whole State affect the question in my opinion. Dogs are personal property. Section 66, Ky. St. 1903; *Commonwealth* v. *Hazelwood,* 84 Ky., 681, 8 Ky. Law Rep., 586, 2 S. W., 489. The State may regulate their ownership, as it may any other property; but I deny that it can regulate the ownership so as to confer the sole benefit directly and exclusively upon any other class of property. Nor can the fact that one class of property sometimes preys upon another class justify such legislation. Hogs are also a danger to other property. They may break into fields of corn and other grain and destroy them. Consequently the State may regulate the ownership of hogs by requiring them to be kept by their owners, and may impose a liability on such owners for their depredations; but has the State the power to impose a license tax on hogs for the benefit of all who raise corn,

or even of those engaged in raising corn who suffer damage by breachy hogs? The imposition of a tax upon a class of property is to that extent the taking of that much of the property taxed, whether the tax be for revenue or for police regulation. And, whether one or the other, it must be for the public. The exercise of every power of government is necessarily for the public. Hence private property cannot be taken by the government for any other than a public use. The exercise of the police power is as subject to this overruling principle of our government as is any other governmental power. When the legislature exercises its power of police regulation of the ownership of dogs, as it may do, it must exercise it in behalf of the whole public, but has not the power to do so for the exclusive benefit of a special or favored class. If the principle be admitted that the only test of such legislation is whether it is within the police power to regulate the ownership of a particular species of property, no matter what may be done with the proceeds of the license fees collected by virtue of such statute, then it would be competent for the legislature to bestow that much of the citizens' property upon any object which the legislature might choose. I think that all such legislation is subject to two tests: First, is the subject one which the State under the police power may regulate? Second, if it is, is the regulation imposed for the benefit of the public; i. e., does the public receive the benefit? Not indirectly, but directly; for it may be assumed, that the public is in a sense benefited by every industry carried on in the State, which adds to the sum of the wealth, or contributes to the happiness of any of its citizens. The State has not the power to tax one class

of property and give the proceeds directly to owners of another class, upon the idea that the latter contribute more to the good of society. I submit that the State could not levy a tax or appropriate money out of the treasury (which is the same thing) for the benefit of unfortunate sheep owners who had lost their sheep by ravages of dogs or disease; nor for one any more than for the other. Nor does the State propose to do so in this legislation. It is attempting to compel all men who own dogs to pay to those who own sheep the loss sustained by the latter from some of the dogs of some of the former. It visits vicariously a penalty which some ought to bear upon many no wise responsible for it, merely because it is difficult to say who ought rightfully to bear it. The real effect of the statute is to make all of one class of property holders pay the losses incurred in a private business by another class, because this loss has been occasioned by the property of some of the first class. I do not believe such legislation is a valid exercise of the police power. We all recognize that sheep husbandry is a business of great value to the State. It may be admitted that the ownership of dogs is of doubtful value. The interests of the former as weighed against the latter may overwhelmingly preponderate from an economic standpoint. Notwithstanding all which, the principle of the law must be the same. It is unsafe to allow mere utilitarianism to bear down those safeguards of the citizen's rights—those checks imposed by the people in their Constitution against the power of the majority and in favor of the individual, that which gives, if anything gives, one man a right safe from the encroachment of all other men; that which recognizes the

supreme right of individual taste and judgment in the matter of acquiring property and in the pursuit of happiness. The legislation here involved makes a breach, I fear, in the dike of the people's liberties—makes one class of people contribute to the business success of another class by the fiat of government without any direct benefit received by the former.

"Hence I feel constrained to dissent from the opinion delivered by the court in this case.

"NUNN and CARROLL, JJ., concur in this dissent.

For the reasons herein stated, I feel impelled to withhold my concurrence in the views of the majority in reaching the conclusion that the act in question squares with the limitations of our Constitution. If legislation of this sort is carried to its logical extreme, it is hard to conceive where constitutional provisions could be invoked to stop it. The legislature could easily adopt a method of selecting classes of our citizens to impose license fees upon and thereby not only conduct the expenses of the government, but set up a fund to be used for such enterprises as the whim of the legislature might dictate. It is to be hoped that the principle of the majority opinion will only be invoked in those classes of cases where the legislature feels an overpowering interest for the protection of the rights of the public.

BACHMAN, J. (dissenting).

I am of the opinion that chapter 61 of the Public Acts of 1919 is unconstitutional, for the reason that it authorizes the appropriation of the public funds to private uses and purposes, and, in so far as the dissenting opinion of Mr. Special Justice SMITH is based upon this ground, I concur therein.